[No. C018015. Third Dist. Jan. 23, 1995.]

KOVR-TV, INC. et al., Petitioners, v.
THE SUPERIOR COURT OF SACRAMENTO COUNTY, Respondent;
JENNIFER WHITTLE, a Minor, etc., et al., Real Parties in Interest.

**COUNSEL**

Diepenbrock, Wulff, Plant & Hannegan, John E. Fischer and Charity Kenyon for Petitioners.

No appearance for Respondent.

Eisen & Johnston, Jay-Allen Eisen, Marian M. Johnston, Karen Leaf, Ann Perrin Farina, Kenneth N. Meleyco and Diane K. Godfrey for Real Parties in Interest.

**OPINION**

**PUGLIA, P. J.**—Petitioners KOVR-TV, Inc., and Mark Saxenmeyer, defendants in the underlying action, seek a writ of mandate directing respondent superior court to vacate its denial of their motion for summary judgment and to grant the motion. We issued an alternative writ and stayed proceedings in the superior court. After further review of the evidence offered in the summary judgment proceedings, we conclude the trial court properly denied defendants' motion for summary judgment.[1] Accordingly, we shall discharge the alternative writ, deny the petition and vacate the stay.

The underlying action was commenced in respondent superior court by Amanda (Mandy) Mehrkens, through her mother, Kim Mehrkens, as guardian ad litem, and by Jennifer and Amanda Whittle, through their father, John Whittle, as guardian ad litem, and by John Whittle, Alice Whittle (the mother of Jennifer and Amanda) and Kim Mehrkens as plaintiffs in their own right. The first amended complaint contains four counts. The first three allege defendants (1) intentionally and (2) negligently inflicted emotional distress upon the minor plaintiffs and (3) invaded their privacy. The fourth count alleges defendants negligently inflicted emotional distress upon the plaintiff parents. The trial court sustained without leave to amend defendants' demurrer to the second, third, and fourth counts. Defendants' motion for summary judgment was thus directed to the remaining count alleging intentional infliction of emotional distress upon the minor plaintiffs, Jennifer, Amanda and Mandy (the minors).

---

[1]Henceforth, "defendant" refers to Saxenmeyer individually and "defendants" to KOVR-TV and Saxenmeyer collectively.

In the count charging intentional infliction of emotional distress upon the minors, the complaint alleges that at all relevant times KOVR-TV operated as TV channel 13 and that defendant was its employee and acting within the course and scope of his employment. On September 3, 1993, Debbie Weber, a next-door neighbor of the minors, murdered her two children, ages six and three respectively, and then committed suicide. The murdered children were friends of the minors. At that time Jennifer was eleven, Amanda seven and Mandy five years old. Later that same day, the minors were at Mandy's home. They were unaware of the violent deaths of the Webers. Defendant and a KOVR-TV cameraman came to the door of Mandy's home. With the "camera rolling," defendant "interrogated" the minors about what had occurred at the Webers. Defendant was aware that neither the minors' parents nor any other adults were present in the home. Defendant informed the minors that Debbie Weber had killed her children and then herself, " 'convey[ing] this information in such a manner as to cause the children emotional distress so that their visible emotional distress would be demonstrative to the TV audience.' " Defendant then questioned the minors about the Weber family. Defendants recorded the entire interview on videotape. The complaint alleges defendants knew or should have known the minors were playmates of the Weber children and would be highly distressed to learn of their deaths.

Defendants moved for summary judgment, arguing as a matter of law that the conduct of the interview, and particularly the manner of informing the minors of the tragic deaths of the Webers, were not such extreme and outrageous acts as would support liability for intentional infliction of emotional distress. Defendants' supporting submission consisted of the videotape interview of the minors and defendant's declaration in which he denied that he told the minors about "their neighbors' tragedy in a manner calculated to invoke a visible emotional response or to alarm them."

In its ruling denying summary judgment, the trial court stated: "Whether or not defendant's conduct was extreme and outrageous is a triable issue of fact. The videotape proffered in support of the motion indicates a triable controversy exists."

Defendants acknowledge in their writ petition that "The only evidence relied on by [the trial court] and the only evidence to be evaluated by this court is the videotape (exhibit H) that records the conversation that is the subject of [the plaintiffs'] sole cause of action." Obviously defendants draw different inferences from the videotape than did the trial court.

A motion for summary judgment must be denied if the moving papers show there is a triable issue of fact. (*Black* v. *Sullivan* (1975) 48 Cal.App.3d

557, 567 [122 Cal.Rptr. 119].) In ruling on the motion, a court must consider both the evidence "and all inferences reasonably deducible from the evidence . . . ." (Code Civ. Proc., § 437c, subd. (c).) The moving party's evidence must leave no room for conflicting inferences as to material facts. "[S]ummary judgment shall not be granted . . . based on inferences reasonably deducible from the evidence, if contradicted by other inferences or evidence, which raise a triable issue as to any material fact." (Code Civ. Proc., § 437c, subd. (c).)

■ "The elements of the tort of intentional infliction of emotional distress are: ' "(1) Extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct. . . ." ' " (*Christensen* v. *Superior Court* (1991) 54 Cal.3d 868, 903 [2 Cal.Rptr.2d 79, 820 P.2d 181].)

■ For purposes of their summary judgment motion, defendants do not contest that the minors suffered severe emotional distress as an actual and proximate result of defendant's conduct. Rather, the motion for summary judgment undertakes to negative a single element of plaintiffs' cause of action as a matter of law. The motion seeks to establish that defendant's disclosures to the minors of the Weber murders and suicide did not constitute conduct which was extreme and outrageous and intended to cause, or made with reckless disregard of the probability of causing, emotional distress. (See *Christensen,* v. *Superior Court, supra,* 54 Cal.3d at p. 903.)

■ "Conduct to be outrageous must be so extreme as to exceed all bounds of that usually tolerated in a civilized community." (*Cervantez* v. *J.C. Penney Co.* (1979) 24 Cal.3d 579, 593 [156 Cal.Rptr. 198, 595 P.2d 975].) Generally, conduct will be found to be actionable where the "recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!' " (Rest.2d Torts, § 46, com. d.)

"Manifestly, the standard for judging outrageous conduct does not provide a 'bright line' rigidly separating that which is actionable from that which is not. Indeed, its generality hazards a case-by-case appraisal of conduct filtered through the prism of the appraiser's values, sensitivity threshold, and standards of civility. The process evoked by the test appears to be more intuitive than analytical . . . ." (*Yurick* v. *Superior Court* (1989) 209 Cal.App.3d 1116, 1128 [257 Cal.Rptr. 665].)

■ The videotape interview of the minors lasted two minutes. At the outset the tape shows the minors just inside the door of a house. The

disembodied voice of the defendant is heard to say, "let me just open the door," and a screen door separating the minors from the defendant and the camera is opened, apparently by defendant. Thereafter, the camera focuses throughout the interview on the minors standing just inside the threshold. Defendant, not shown on the tape, is apparently standing just outside the threshold. The voices on the tape are those of defendant and the minors.

By questioning the minors, defendant establishes that this is Mandy's house, Jennifer is babysitting Mandy, and Amanda is Jennifer's sister; the minors know the Weber children; the Weber children are "nice" and the minors "play with them all the time"; the minors do not know "what happened" to the Weber children.

At this point defendant states: "Well, the mom has killed the two little kids and herself." Amanda exclaims: "Oh my God!" Defendant then inquires if the minors know of "any problems" at the Webers. The minors state they do not. After a few more questions about the Webers, defendant thanks the minors, asks them their names and terminates the interview.

The gloss the defendants place on the videotape interview emphasizes that defendant did not provide any details of when or how the deaths of the Webers occurred. Moreover, he spoke to the minors in a manner "calculated [not] to frighten or repulse" them. Furthermore, the minors do not visibly appear (on the tape) to be afraid of defendant or distressed on learning of the Weber deaths.

Our review of the videotape confirms the defendants' characterization so far as it goes. Defendant spoke to the minors in a nonthreatening voice. He used language and tone appropriate in speaking to young children. He did not reveal any details of the Weber killings.

However, defendants' characterization of the videotape interview is highly selective. It may be inferred from the videotape that the encounter between defendant and the minors occurred suddenly and without warning. Defendant knocked at the door of a private residence. All three minors came to the door. When they opened the door bright photo lights were turned on directly in their faces. A strange adult male (defendant) wielding a microphone in his hand greeted them and opened the screen door, inferably to remove any physical obstruction between the minors and the camera. The minors, ages five, seven and eleven, were manifestly of tender years. There were no adults in the home and the minors were obviously too young either to consent to an intrusion by strangers into a private residence or to exercise any control over strangers who appeared there. It does not appear that they were given any

choice as to whether their images and voices would be captured on videotape and broadcast publicly on television. The videotape reveals an uninvited, intrusive encounter by adult strangers with children of tender years not in a public place but in their home. (Cf. *Miller* v. *National Broadcasting Co.* (1986) 187 Cal.App.3d 1463, 1483-1484 [232 Cal.Rptr. 668, 69 A.L.R.4th 1027].) A jury could conclude these facts reveal an "alarming absence of sensitivity and civility." (*Id.*, at p. 1488.)

The videotape reveals that after defendant ascertained the minors knew the Weber children and "played with them all the time," but did not know what had happened to them, he volunteered to them information with emotionally devastating potential, especially to children of such tender years. It is possible that, having commenced the interview, defendant felt a need to explain to the minors the reasons for the unusual activity in the neighborhood. It is also possible defendant simply gave no thought to the potential consequences of informing the minor children of information that an adult might be expected to take in stride. Even the most benign explanation betrays a certain rashness of judgment, although we would agree with defendants that conduct uninformed by sound judgment is not necessarily synonymous with extreme and outrageous conduct. (See Rest.2d Torts, *supra*, § 46, com. d.)

Plaintiffs argue, however, that the contents of the videotape are reasonably susceptible to the inference that defendant was bent upon *making* news, not *gathering* it. Plaintiffs would infer that defendant informed the minors of the tragic deaths of the Webers in the hope of eliciting a vividly emotional reaction and capturing it on videotape. From our review of the videotape we are satisfied such an inference, although not compelled, is within the realm of reason. Even if defendant was innocently gathering news when he initiated the interview, it is a reasonable inference that when he discovered the minors were friends of the Weber children but unaware of their demise, he abruptly informed them "the mom has killed the two little kids and herself," in the hope it would elicit an emotional reaction that would be "newsworthy," e.g., suitable to redeem a promise of "film at eleven." We further conclude a jury could find that a television reporter who attempts deliberately to manipulate the emotions of young children for some perceived journalistic advantage has engaged in conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency . . . ." (Rest.2d Torts, *supra*, § 46, com. d.)

Defendants attach significance to the fact they did not broadcast the interview. The record does not reveal why the interview was not broadcast. We may speculate that the minors' reaction to defendant's startling revelation was not deemed "newsworthy," or even that KOVR-TV responsibly

concluded the interview technique transcended legitimate newsgathering. Neither reason, if reasons they be, negative the minors' allegations that defendant's conduct was extreme and outrageous.

Defendants argue the situation here is no different from that of an adult neighbor or an authority figure such as a teacher or a policeman who volunteers to inform a child of a tragedy befalling the child's friends. Whether civilized society would regard such a person's gratuitous disclosure to a child of such emotionally upsetting news as an intolerable usurpation of parental prerogatives is a question not before us. We are not concerned here only with a meddlesome individual who insinuates himself into the parental relationship by gratuitously assuming to perform a sensitive parental prerogative. The issue here is whether defendants have negatived any reasonable inference that defendant's conduct was deliberately calculated, or recklessly undertaken, to elicit a "newsworthy" reaction, and if so, whether such conduct exceeds the bounds tolerated by civilized society. (*Yurick* v. *Superior Court*, *supra*, 209 Cal.App.3d at p. 1129.) As we have stated, although not compelled, the videotape interview is reasonably susceptible to such an inference. Given that possible interpretation, defendants have failed to negative the existence of a material triable issue of fact with regard to plaintiffs' allegations of extreme and outrageous conduct.

■ If it is assumed that defendant's conduct was extreme and outrageous, the question still remains whether defendants have established as a matter of law that defendant did not intend to cause, or recklessly disregard the probability of causing, emotional distress. The videotape evidence does not as a matter of law dispel a reasonable inference of actionable intent. The only other evidence submitted by defendants was defendant's declaration in which he states: "I did not intend to injure the children. I assumed when we started to talk that they already knew what was going on outside. [¶] When I realized they still did not know what was going on two doors away, I told them that the mother had killed the kids and herself. I did not tell them about their neighbors' tragedy in a manner calculated to invoke a visible emotional response or to alarm them."

Code of Civil Procedure section 437c, subdivision (e) is dispositive on the question of intent. It provides in relevant part: "summary judgment may be denied in the discretion of the court . . . where a material fact is an individual's state of mind, or lack thereof, and that fact is sought to be established solely by the individual's affirmation thereof."

In any event, it is not essential to liability that a trier of fact find a malicious or evil purpose. It is enough that defendant "devoted little or no

thought" to the probable consequences of his conduct. (*Miller* v. *National Broadcasting Co., supra*, 187 Cal.App.3d at p. 1487.) In dealing with children under the age of 12, the trier of fact reasonably could find that " '[l]ittle or no thought' constitutes . . . 'reckless disregard' of the rights and sensitivities of others." (*Id.*, at p. 1488.)

■ Defendants assert that imposition of liability based on the conduct disclosed in the videotape infringes on First Amendment freedoms of speech and press. Defendants argue defendant was simply "relaying truthful information," and that any sanction imposed therefor is inimical to a free press. (Cf. *The Florida Star* v. *B.J.F.* (1989) 491 U.S. 524, 533, 536 [105 L.Ed.2d 443, 455, 457, 109 S.Ct. 2603].

The inference of tortious conduct which may be drawn from the videotape is not to be confounded with legitimate news gathering or the truthful dissemination of information, nor is defendant's status as a journalist inconsistent with such an inference. A reporter has "no special immunity from the application of general laws. He has no special privilege to invade the rights and liberties of others." (*Associated Press* v. *Labor Board* (1937) 301 U.S. 103, 132-133 [81 L.Ed. 953, 961, 57 S.Ct. 650].) First Amendment decisions "do not stand for the proposition that the press and its representatives are immune from liability for crimes and torts committed in news gathering activities simply because the ultimate goal is to obtain publishable material." (*Nicholson* v. *McClatchy Newspapers* (1986) 177 Cal.App.3d 509, 518 [223 Cal.Rptr. 58]; see *Galella* v. *Onassis* (2d Cir. 1973) 487 F.2d 986, 995 [29 A.L.R.Fed. 879].) If indeed defendant sought to elicit an emotional reaction from the minors for the voyeuristic titillation of KOVR-TV's viewing audience, this is shameless exploitation of defenseless children, pure and simple, not the gathering of news which the public has a right to know. A free press is not threatened by requiring its agents to operate within the bounds of basic decency. (Cf. *Gallela* v. *Onassis, supra*, 487 F.2d at p. 996.)

The alternative writ, having served its purpose is discharged; the petition for peremptory writ of mandate is denied and the stay previously entered is vacated.

Sparks, J., and Scotland, J., concurred.

A petition for a rehearing was denied February 16, 1995.