[No. B113017. Second Dist., Div. Five. July 9, 1998.]

PATRICIA ANN COCHRAN et al., Plaintiffs and Appellants, v. JOHNNIE L. COCHRAN, JR., Defendant and Respondent.

**[Opinion certified for partial publication.*]**

*Part 1 of Discussion of this opinion is not certified for publication. (See Cal. Rules of Court, rules 976(b) and 976.1.)

**COUNSEL**

Tanke & Willemsen, Tony J. Tanke and Karen Bautista Hobin for Plaintiffs and Appellants.

Fogel, Feldman, Ostrov, Ringler & Klevens, Larry R. Feldman and Leighanne Lake for Defendant and Respondent.

## Opinion

**GODOY PEREZ, J.**—Plaintiffs Patricia Ann Cochran and April M. Somers appeal from the judgment of dismissal entered after the trial court sustained without leave to amend the demurrers which defendant Johnnie L. Cochran, Jr., brought to their first amended complaint. For the reasons set forth below, we affirm the judgment.

### Facts and Procedural History

In March 1995, plaintiff and appellant Patricia Ann Cochran sued defendant and respondent Johnnie L. Cochran, Jr., for his February 1995 breach of an alleged 1983 *Marvin*[1] "palimony" agreement for lifetime support. (Cochran v. Cochran (Super Ct. L.A. County, 1995, No. BC 124156) (hereafter *Cochran I.*).) Her complaint also included causes of action for a constructive trust, declaratory relief, fraud, and negligent and intentional infliction of emotional distress. On June 8, 1995, demurrers were sustained to the operative first amended complaint, some with, and some without, leave to amend. The complaint was not amended further and an appeal was taken.

On November 21, 1996, Patricia Ann Cochran filed another complaint against Johnnie L. Cochran, Jr., this time seeking to rescind a 1983 property settlement agreement the two had allegedly entered. (Cochran v. Cochran (Super Ct. L.A. County, 1996, No. EC 021315), (hereafter Cochran II.).) The complaint in Cochran II also alleged that the parties entered a new *Marvin* agreement in January 1993 when, at Johnnie Cochran's request, Patricia Cochran quit her job with a company called Ipson in exchange for his promise of lifetime support.

In addition to various causes of action based on the 1983 settlement agreement and the alleged 1993 *Marvin* agreement, Patricia Ann Cochran and her daughter, plaintiff and appellant April M. Somers, each brought causes of action against Johnnie L. Cochran, Jr., for intentional infliction of emotional distress.[2] This cause of action was based on a message which respondent allegedly left on the answering machine of his and Patricia's son, a message which appellants construed as a death threat against April. The complaint included allegations of a lengthy relationship between Patricia and respondent, including allegations that she gave birth to his son, that they held themselves out as husband and wife, and that respondent left Patricia in

---

[1]*Marvin* v. *Marvin* (1976) 18 Cal.3d 660 [134 Cal.Rptr. 815, 557 P.2d 106].

[2]We hereafter refer to respondent Johnnie L. Cochran, Jr., as "respondent" and to appellants Patricia Ann Cochran and April M. Somers collectively as "appellants." For ease of reference, when we refer to appellants individually, we will do so by their first names.

1986 after marrying someone else. Respondent demurred to the complaint on the grounds that the statements attributed to him did not, as a matter of law, constitute intentional infliction of emotional distress and that the other causes of action were essentially the same as those dismissed by the court in Cochran I, which was then still on appeal.

Rather than oppose the demurrer, appellants filed a first amended complaint on January 27, 1997. The first cause of action was by Patricia for breach of a 1993 oral agreement for lifetime support in exchange for which Patricia would quit her job and stay home. She alleged that respondent breached that agreement by stopping support in February 1995. The other two causes of action were brought by appellants for intentional infliction of emotional distress. They are based on essentially the same allegations, which we therefore set forth and discuss interchangeably.

Patricia lived with respondent for many years. Since 1995, their relationship has been extremely antagonistic and distressing to Patricia. April had also lived with respondent. He knew that appellants had been affected by the antagonism between him and Patricia and also knew of appellants' "special susceptibility to emotional distress, particularly with respect to" their relationships with him. Before June 29, 1996, respondent had communicated to appellants that he was "exceptionally angry at [them] because they had appeared on a television show and told the truth about [respondent's] relationship to [them]." Respondent, who had just successfully defended O.J. Simpson in Simpson's notorious double murder trial "was perceived by [appellants] as an attorney with the power and ability to cause [appellants] serious harm, including serious harm to their well being."

The first amended complaint then alleged that respondent phoned his son's home on June 29, 1996, and left a message on his son's answering machine noting that he was about to go to Florida, where April was living at the time. Respondent's message continued: " 'What I am going to do is go down and deliver for April the Value Jet around the world vacation package. She can fly any time she wants to as soon as they start flying again. Ok John, I just wanted you to be aware of that. A little special thing I got for her.' " This message referred to the then recent crash of a Value Jet airliner in the Florida Everglades which killed all aboard. Respondent knew that Patricia was living with their son at the time and would both hear the message and relay it to April. Respondent intended the message to be taken as a death threat against April, and appellants, upon hearing the message, understood it as such. As a result of hearing the message, appellants suffered severe and extreme emotional distress.

Respondent demurred to the first cause of action for breach of contract on the ground it was part of the same claims asserted in Cochran I and, as such,

the complaint in Cochran II was sham and without merit. He demurred to the intentional infliction of emotional distress claims on the grounds that the message was intended for his son, not for appellants, and that as a matter of law the remarks were no more than a bad joke and therefore insufficiently outrageous to state a cause of action. On April 3, 1997, the trial court sustained respondent's demurrers without leave to amend and ordered the complaint dismissed on April 9, 1997.

On July 14, 1997, we filed our decision in Cochran I (*Cochran* v. *Cochran* (1997) 56 Cal.App.4th 1115 [66 Cal.Rptr.2d 337]), reversing in part the order sustaining respondent's demurrers to the first amended complaint in Cochran I. In that decision, we held that the statute of limitations had not run on Patricia's claim for breach of the alleged 1983 *Marvin* agreement, and permitted her action to continue only to the extent it was based on that agreement. We affirmed the dismissal of her other causes of action.

## STANDARD OF REVIEW

In reviewing a judgment of dismissal after a demurrer is sustained without leave to amend, we must assume the truth of all facts properly pleaded by the plaintiff-appellant. Regardless of the label attached to the cause of action, we must examine the complaint's factual allegations to determine whether they state a cause of action on any available legal theory. Reversible error is committed if the facts alleged show entitlement to relief under any possible legal theory. (*Cochran* v. *Cochran, supra,* 56 Cal.App.4th at pp. 1119-1120.)

We will not, however, assume the truth of contentions, deductions or conclusions of fact or law and may disregard allegations that are contrary to the law or to a fact of which judicial notice may be taken. When a ground for objection to a complaint, such as the statute of limitations, appears on its face or from matters of which the court may or must take judicial notice, a demurrer on that ground is proper. (Code Civ. Proc., § 430.30, subd. (a); *Cochran* v. *Cochran, supra,* 56 Cal.App.4th at p. 1120.) We may take judicial notice of the records of a California court. (Evid. Code, § 452, subd. (d).) We must take judicial notice of this state's decisional and statutory law. (Evid. Code, § 451, subd. (a).)

## DISCUSSION

1. *Dismissal of the First Cause of Action Was Proper**

. . . . . . . . . . . . . . . . . . . . . . . . .

*See footnote, *ante*, page 488.

## 2. *Intentional Infliction of Emotional Distress*

 The tort of intentional infliction of emotional distress is comprised of three elements: (1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless ·disregard of the probability of causing, emotional distress; (2) the plaintiff suffered severe or extreme emotional distress; and (3) the plaintiff's injuries were actually and proximately caused by the defendant's outrageous conduct. (*KOVR-TV, Inc.* v. *Superior Court* (1995) 31 Cal.App.4th 1023, 1028 [37 Cal.Rptr.2d 431] (hereafter *KOVR-TV*).) Resolution of this matter turns on the first element—whether or not the conduct alleged was sufficiently extreme and outrageous.

 In order to meet the first requirement of the tort, the alleged conduct " '. . . must be so extreme as to exceed all bounds of that usually tolerated in a civilized community.' [Citation.] Generally, conduct will be found to be actionable where the 'recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!" ' (Rest.2d Torts, § 46, com. d.)" (*KOVR-TV, supra,* 31 Cal.App.4th at p. 1028.) That the defendant knew the plaintiff had a special susceptibility to emotional distress is a factor which may be considered in determining whether the alleged conduct was outrageous. (*Angie M.* v. *Superior Court* (1995) 37 Cal.App.4th 1217, 1226 [44 Cal.Rptr.2d 197]; Rest.2d Torts, § 46, com. f, pp. 75-76.)

There is no bright line standard for judging outrageous conduct and " '. . . its generality hazards a case-by-case appraisal of conduct filtered through the prism of the appraiser's values, sensitivity threshold, and standards of civility. The process evoked by the test appears to be more intuitive than analytical . . . .' [Citation.]" (*KOVR-TV, supra,* 31 Cal.App.4th at p. 1028.) Even so, the appellate courts have affirmed orders which sustained demurrers on the ground that the defendant's alleged conduct was not sufficiently outrageous. (See, e.g., *Ankeny* v. *Lockheed Missiles & Space Co.* (1979) 88 Cal.App.3d 531, 536-537 [151 Cal.Rptr. 828].)

 ██ ██ Because appellants contend they can allege additional facts to support their emotional distress claims, we will set them forth accordingly and consider them in reviewing the sufficiency of their first amended complaint:[3] (1) Respondent allowed his wife to be publicly presented as the mother of his and Patricia's son, prompting appellants to

---

[3]If the plaintiff shows a complaint can be amended to state a cause of action, it is an abuse of discretion to sustain a demurrer without leave to amend. (*Hendy* v. *Losse* (1991) 54 Cal.3d 723, 742 [1 Cal.Rptr.2d 543, 819 P.2d 1].)

publicly reveal the truth about their relationships with respondent; (2) as a result of appellants' public disclosures, respondent became "enraged" because they "tarnished his public image . . . ." ▮ As punishment, respondent breached his *Marvin* agreement and stopped paying further support to Patricia in February 1995. In response, Patricia sued for breach of contract; (3) for several years before the date respondent left the threatening message on his son's answering machine, and with increasing frequency after appellants went public with the facts about their relationships with respondent, he made both general and specific threats against them, including statements such as "You know how powerful I am," "you'll be sorry," he would have them watched and followed wherever they went, he would sue any lawyer that represented them, and Patricia would never win a lawsuit against him because he had friends in every court and could control the decisions of any court hearing her case; (4) as a result of these statements, which were communicated to appellants either directly or indirectly, appellants feared respondent; (5) appellants had been financially and emotionally dependent on respondent much of their lives, a dependency which he encouraged and relished. He managed Patricia's finances and, at various times, he directed Patricia to quit her jobs and forego her career. He told April she could not go to college. Respondent knew appellants feared him and they believed he would continue to control their lives even after Patricia stopped living with him; (6) respondent knew Patricia was living with their son when he left the threatening phone message and knew the message would be conveyed to appellants. When he left the message, the Value Jet air crash that killed hundreds of people was a major news event that respondent believed appellants would know about. At the time, he was even acting as counsel for the families of some Value Jet crash victims. He left the phone message knowing of appellants' "peculiar susceptibility to threats from [respondent] as a result of their prior dependency on him and his exercise of control over them . . ."; (7) the tone of respondent's voice on the message tape was "somber, threatening, and stone cold. The manner of presentation is deadly serious. There is no hint or suggestion of humor in [respondent's] voice." Appellants believed it was a serious threat; and (8) at all relevant times, respondent knew appellants were peculiarly susceptible to emotional distress as a result of "his relationship that included co-habitation, business partnerships and other matters" as alleged in Cochran I, respondent's relationship with April and her dependence on him as a result of Patricia's cohabitation with him, and "[respondent's] pattern of threats against [appellants], as more fully described above."

Appellants thus devote a great deal of time to facts which they contend show they were especially susceptible to emotional distress based on their past relationships and dealings with respondent. Assuming for discussion's

sake alone that appellants have sufficiently alleged facts showing they were susceptible to emotional distress, " 'major outrage is still essential to the tort; and the mere fact that the actor knows that the other will regard the conduct as insulting, or will have his feelings hurts, is not enough.' " (*Newby* v. *Alto Riviera Apartments* (1976) 60 Cal.App.3d 288, 297, fn. 2 [131 Cal.Rptr. 547], disapproved on other grounds by *Marina Point, Ltd.* v. *Wolfson* (1982) 30 Cal.3d 721, 740, fn. 9 [180 Cal.Rptr. 496, 640 P.2d 115, 30 A.L.R.4th 1161], quoting Rest.2d Torts, § 46, com. f, pp. 75-76.)

In evaluating whether the defendant's conduct was outrageous, it is "not . . . enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." (Rest.2d Torts, § 46, com. d, p. 73.)

Further, the tort does not extend to "mere insults, indignities, *threats,* annoyances, petty oppressions, or other trivialities. The rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind. There is no occasion for the law to intervene in every case where some one's feelings are hurt. There must still be freedom to express an unflattering opinion, *and some safety valve must be left through which irascible tempers may blow off relatively harmless steam. . . .*" (Rest.2d Torts, § 46, com. d, p. 73, italics added; *Thomas* v. *Douglas* (9th Cir. 1989) 877 F.2d 1428, 1435 [applying Rest.2d Torts, § 46, principles to Ariz. law]; *Dove* v. *PNS Stores, Inc.* (C.D.Cal. 1997) 982 F.Supp. 1420, 1424; *Newby* v. *Alto Riviera Apartments, supra,* 60 Cal.App.3d at p. 297.)

Examples of decisions where a defendant's conduct was deemed sufficiently outrageous include: *Sanchez-Corea* v. *Bank of America* (1985) 38 Cal.3d 892, 909 [215 Cal.Rptr. 679, 701 P.2d 826] (bank failed to advise plaintiffs, who were small business operators, that the bank would give no further loans, bank misrepresented that further loans would be made if plaintiffs assigned all past, present and future accounts receivable to the bank, then refused further loans after plaintiffs did so, bank forced plaintiffs to execute excessive guarantees and security agreements, and bank employees publicly ridiculed plaintiffs, including the use of profanities); *Alcorn* v. *Anbro Engineering, Inc.* (1970) 2 Cal.3d 493, 496-497 [86 Cal.Rptr. 88, 468

P.2d 216] (plaintiff employee, who was Black, alleged he was fired in a despicable manner when his supervisor did so while shouting various racial epithets); *Newby* v. *Alto Riviera Apartments, supra,* 60 Cal.App.3d at pp. 297-298 (When tenant got involved in rent protest, landlord shouted at her, ordered her out of her apartment within three days, threatened to throw her out personally, and said " 'We are going to handle this the way we do down South.' ").

Cases where the defendant's conduct was not deemed outrageous include: *Schneider* v. *TRW, Inc.* (9th Cir. 1991) 938 F.2d 986, 992-993 (applying California law, summary judgment held proper where plaintiff's evidence showed her supervisor screamed, yelled and made threatening gestures while criticizing her job performance); *Thomas* v. *Douglas, supra,* 877 F.2d at pp. 1434-1435 (plaintiff police officer, a whistleblower, sued department for emotional distress when it failed to take steps to ease his fears of retaliation; summary judgment properly granted when only evidence of a threat came from an unnamed officer who said that he wanted to know who reported the other officers' misconduct because that person's "ass was grass"); *Ankeny* v. *Lockheed Missiles & Space Co., supra,* 88 Cal.App.3d at pp. 536-537 (demurrer proper where plaintiff alleged his employer prevented him from becoming a union steward, transferred him from job to job, wrongly denied him promotions, assigned him inappropriate job tasks, and personally insulted him).

 While respondent portrays the "Value Jet" message as a misguided attempt at gallows humors which was in poor taste, appellants consider it an actionable death threat under *Kiseskey* v. *Carpenters' Trust for So. California* (1983) 144 Cal.App.3d 222 [192 Cal.Rptr. 492] (hereafter *Kiseskey*). The plaintiff in *Kiseskey* sued a labor union for intentional infliction of emotional distress, alleging a months-long campaign of harassment designed to coerce him into signing another agreement with the union. The plaintiff alleged that various union officials phoned him on different occasions and said: " 'You are a no good son of a bitch and if you don't resign the agreement and get in set with the union, you'll be put in the hospital,' " " 'Rejoin the union or you might not live to regret it,' " and " 'Since you do not seem to be concerned about your safety and well-being, maybe you will be concerned about the well-being of your wife and children.' " The appellate court overruled the trial court's order sustaining the union's demurrer, holding that each statement, taken alone or considered together as part of a course of conduct, was sufficiently outrageous to state a cause of action for intentional infliction of emotional distress. (*Id.* at pp. 229-230.)

Viewing appellants' allegations in light of the applicable law, we hold that the message which respondent allegedly left was the "steam" of an irascible temper and not smoke from the fire of an actionable death threat.

First, we see little comparison between *Kiseskey* and the "Value Jet" message which respondent allegedly left on his son's answering machine. The plaintiff in *Kiseskey* alleged that union goons made both direct and thinly veiled threats of physical violence as part of an ongoing labor dispute. To the extent the message which respondent allegedly left on his son's answering machine can be characterized as a threat, its meaning is hidden and lacking in immediacy. It was also made at least 16 months after the television appearance by appellants which was the alleged catalyst of respondent's anger with them.[4]

Next, at the heart of appellants' claim lie the following allegations: Respondent and Patricia had a long-standing intimate relationship, which produced a son; Patricia and April both lived with respondent at some point; respondent eventually left Patricia to marry another; nine years later, appellants became upset when respondent portrayed his wife as the mother of his and Patricia's son; in response, appellants went on a television show and revealed the truth about their relationships with respondent; this made respondent very angry and in February 1995, he stopped making support payments to Patricia; the fallout from this blowup produced antagonism which led to hurt feelings and distress by appellants; some 16 months later, respondent left the "Value Jet" message on his son's answering machine, knowing appellants would hear it.

In short, the parties to an intimate relationship gone bad were now feuding. Those feuds are often accompanied by an exchange of hostile unpleasantries which are intended to sting whoever sits at the delivery end. While the pain inflicted might be real, the tort of intentional infliction of emotional distress was never intended to remove all such barbs. To hold otherwise would needlessly congest our courts with trials for hurts both real and imagined which are best resolved elsewhere.

There is no indication that respondent ever took any steps to either carry out his alleged threat or, at the least, make the threat appear more real. Without more, the "Value Jet" message which respondent allegedly left is little more than the release of steam from the pressure cooker of the parties' ill will. As such, it is precisely what the Restatement had in mind when it excluded "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities" from the tort and referred to the need for a safety valve "through which irascible tempers may blow off relatively harmless steam." (Rest.2d Torts, § 46, com. d, p. 73.)

---

[4]We calculate the time period as at least 16 months based on appellants' allegations that respondent stopped his support payments to Patricia in February 1995 in retaliation for appellants' televised remarks. The interview which allegedly prompted respondent's anger might well have occurred sometime earlier.

Appellants try to breathe menace into the message by referring to an alleged pattern of previous threats made by respondent. Their attempt is not persuasive. Appellants contend they could allege that respondent made both general and specific threats over the years, and did so more often after their televised revelations about their relationships with him. Apart from lacking specificity as to the time, place or context of those alleged threats, the remarks attributed to respondent, considered either separately or together, generate only more "steam." These include statements such as "You know how powerful I am," "you'll be sorry," that he would have them watched and followed wherever they went, he would sue any lawyer representing them, and that Patricia would never win a lawsuit against him because he had friends in every court and could control their decisions.

Such alleged statements contain no indication of actionable threat or menace. Instead, they are the kind of boastful, peevish, spleen-venting which frequently occurs between the parties to an intimate relationship gone bad. As with the "Value Jet" message, if respondent had tried to follow through on any of his purported threats, they might be viewed in a more menacing context, but appellants have not made or proposed any such allegations. Absent such allegations, they too are the mere insults, threats, annoyances and petty oppressions which fall outside the tort of intentional infliction of emotional distress. In this context, the alleged "Value Jet" message was not "so extreme as to exceed all bounds of that usually tolerated in a civilized community." (*KOVR-TV, supra*, 31 Cal.App.4th at p. 1028.) While a recitation of the alleged facts to an average member of the community might prompt him to shake his head in disapproval, it would not lead him to exclaim, "Outrageous!" (Rest.2d Torts, § 46, com.d, p. 73.)

### DISPOSITION

For the reasons set forth above, the order sustaining the demurrers of respondent Johnnie L. Cochran, Jr., and dismissing the first amended complaint of appellants Patricia Ann Cochran and April M. Somers, is affirmed. Respondent to recover his costs on appeal.

Turner, P. J., and Armstrong, J., concurred.

Appellants' petition for review by the Supreme Court was denied October 28, 1998.