Filed 2/29/24  Garaventa v. Binswanger CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

|  |  |
|---|---|
| JOSEPH GARAVENTA,<br><br>          Plaintiff and Appellant,<br><br>v.<br><br>WALTER BINSWANGER, III,<br><br>          Defendant and Respondent. | A165750<br><br>(Contra Costa County<br>Super. Ct. No. MSC18-01289) |

Plaintiff Joseph Garaventa appeals following the trial court's orders sustaining without leave to amend the demurrers of defendant Walter Binswanger, III.  We affirm.

BACKGROUND[1]

Joseph Garaventa is one of five adult siblings; the others are Silvio Garaventa, Jr., Marie Louise Adler, Louisa Binswanger, and Linda Colvis.[2]

---

[1] " ' "[W]e treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law." ' " (*Rincon Band of Luiseño Mission Indians etc. v. Flynt* (2021) 70 Cal.App.5th 1059, 1085 (*Rincon*).)  Our statement of the background facts reflects this standard of review.  We omit background facts not relevant to this appeal.

[2] For convenience, we will refer to the family members by their first names.  No disrespect is intended.

1

In 2015, after the siblings' surviving parent died, Louisa became the trustee of the family trust (Trust). The Trust controls 70 percent of the shares of the family business (the Company) and the remaining 30 percent is divided equally among the five siblings.

The terms of the Trust provide for the equal distribution of the Trust's interest in the Company to the five siblings, and for the distribution of the Trust estate to subtrusts for the benefit of the five siblings. Louisa, as trustee, has not made these distributions, but has paid herself substantial trustee fees and has paid significant additional fees to the law firm representing her, where her son, respondent Walter Binswanger III (Walter III), works as an attorney.

Walter III advises Louisa and, in 2017, drunkenly bragged that he had put together a plan whereby he; Louisa; Louisa's husband, Walter Binswanger II (Walter II); and Silvio would disadvantage Joseph, Linda, and Linda's husband.

In 2018, Joseph was removed as CEO of the Company after expressing concerns about Louisa's actions as trustee. This removal was planned by Louisa, Silvio, and Marie; and implemented by Louisa using her supermajority control in the Company as trustee.

In 2019, bullets were fired at a trailer on property owned by Louisa, Walter II, and/or Walter III. More than six months later, Joseph received an anonymous letter referring to the shooting, detailed below (part I.A, *post*).

In 2020, Joseph filed the underlying lawsuit against Louisa, Walter II, Silvio, and Walter III (collectively, Defendants), alleging claims for violations of the federal Racketeer Influenced and Corrupt Organizations Act (RICO; 18 U.S.C. § 1962, subds. (b)–(d)), intentional infliction of emotional distress, breach of fiduciary duty, unfair business practices (Bus. & Prof. Code,

2

§ 17200), constructive fraud, unjust enrichment, accounting, and negligence. After Defendants filed a demurrer to the original complaint, Joseph filed a first amended complaint, realleging the claims in the original complaint and adding a claim for deceit.

The trial court granted the parties' stipulation to permit Joseph to file a second amended complaint, which alleged the same claims. Defendants demurred. The trial court sustained the demurrer with leave to amend as to all causes of action against Walter III.

The third amended complaint (3AC) alleged, as relevant here, claims for RICO violations, breach of fiduciary duty, unjust enrichment, and intentional infliction of emotional distress. Defendants filed a demurrer. With respect to Walter III, the trial court sustained the demurrer without leave to amend as to the RICO claims; sustained the demurrer with leave to amend as to the intentional infliction of emotional distress and unjust enrichment claims; and overruled the demurrer as to the breach of fiduciary duty claim.

The fifth amended complaint (5AC)[3] alleged, as relevant here, claims for intentional infliction of emotional distress and breach of fiduciary duty. Defendants demurred. The trial court sustained the demurrer without leave to amend in its entirety as to Walter III, and subsequently entered judgment dismissing Walter III from the case.

Joseph appeals, challenging the orders sustaining without leave to amend Walter III's demurrers to the intentional infliction of emotional distress, RICO, and breach of fiduciary duty claims.

---

[3] After Joseph filed a fourth amended complaint, the parties stipulated to allowing Joseph to file a fifth amended complaint.

3

DISCUSSION

We review an order sustaining a demurrer de novo, "independently examin[ing] the operative complaint 'to determine whether it alleges facts sufficient to state a cause of action under any legal theory.' " (*Rincon, supra,* 70 Cal.App.5th at p. 1085.)

I.    *Intentional Infliction of Emotional Distress*

Joseph argues the trial court erred in sustaining Walter III's demurrer to the intentional infliction of emotional distress claim. "The tort of intentional infliction of emotional distress is comprised of three elements: (1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff suffered severe or extreme emotional distress; and (3) the plaintiff's injuries were actually and proximately caused by the defendant's outrageous conduct." (*Cochran v. Cochran* (1998) 65 Cal.App.4th 488, 494 (*Cochran*).)  We agree with the trial court that Joseph fails to allege extreme and outrageous conduct.

A.    *Additional Background*

The conduct on which this claim is based is an anonymous letter to Joseph, which is attached as an exhibit to the 5AC.[4]  The letter provides, in its entirety, as follows:

"We are contacting you to avoid a situation which will result in life-changing ramification if our cautionary message is not taken seriously.

"As the father of Andrew, Steven and Katherine, you undoubtably wish to keep your children safe and protected.  We too have family members that we wish to keep safe and protected.

---

[4] The 5AC alleges that an attached photograph shows Walter II "purchasing the stamp that was used to send the" anonymous letter.

"The Giacomelli family[5] is part of our family.  Many of us are very protective of Maria and her daughters since Ray's death.  Ray's family is loved and respected by many in our community.  Anyone who is important to Maria is important to us.  This would include Maria's son-in-laws, [sic] their families and friends.

"This is a cordial communication to advise you, your family members, friends and caretaker against harassing, threatening or causing any harm or disturbance toward Maria's son-in-laws, [sic] friends or damaging any of their possessions or property in the upcoming hunting season.  Maria's grandchildren will also being [sic] enjoying the hunting season on the property located across the levee from you.  Do not allow anyone or anything disrupt [sic] their enjoyment.  This includes making false complaints or allegations to the Game Warden against your neighbors in an effort to cause them problems.

"We are aware of the bullets that penetrated the trailers on Maria's son-in-law's land.  The trajectory of the slugs are from your property.  Let's be very clear, you must prevent this dangerous behavior from being repeated. We are holding you completely responsible for any harmful actions against Maria's family by one of your family members, guests or caretaker.  Maria wants no harm to come to her family, as YOU do not want harm to come to Andrew, Steven or Katherine.  Maria is not aware that we are contacting you. Do not contact her regarding this letter.  You are not to cause her any anguish by involving her.

"This message is a friendly notification to prevent innocent people in your family and in Maria's family from become [sic] victims because of some

---

[5] The 5AC alleges Maria Giacomelli and her family live on adjacent property.

5

escalating and ongoing feud.  You, Mr. Garaventa need to control this situation.  You are responsible for everyone's actions on your property.  The repercussions of causing harm to any of the Giacomelli family or friends will not be pleasant.  You can protect and keep your family safe by keeping all others safe and protected as well.  Take this recommendation seriously."

B. *Page Limitation*

In its order sustaining with leave to amend Defendants' demurrer to the intentional infliction of emotional distress count as alleged in the 3AC, the trial court directed that additional allegations regarding this claim in a subsequent pleading "shall not exceed one page, double-spaced."  Joseph argues the trial court erred in imposing this limitation.  Both parties agree our review is for abuse of discretion.

The court did not abuse its discretion.  Joseph had previously been granted leave to amend the claim, without page limitations, following the court's order sustaining Defendants' demurrer to Joseph's second amended complaint.  The 3AC was more than 25 pages long.  The trial court carefully considered the deficiencies in the allegations and we cannot say its determination that any cure could be made in one page or less was an abuse of discretion.

C. *Extreme and Outrageous Conduct*

"In order to meet the [extreme and outrageous conduct] requirement of the tort, the alleged conduct ' ". . . must be so extreme as to exceed all bounds of that usually tolerated in a civilized community." [Citation.]  Generally, conduct will be found to be actionable where the "recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!' " [Citation.]' [Citation.]  That the defendant knew the plaintiff had a special susceptibility to emotional

6

distress is a factor which may be considered in determining whether the alleged conduct was outrageous. [Citations.] [¶] There is no bright line standard for judging outrageous conduct and ' ". . . its generality hazards a case-by-case appraisal of conduct filtered through the prism of the appraiser's values, sensitivity threshold, and standards of civility. The process evoked by the test appears to be more intuitive than analytical . . . ." ' " (*Cochran, supra,* 65 Cal.App.4th at p. 494.) "In evaluating whether the defendant's conduct was outrageous, it is 'not . . . enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.' (Rest.2d Torts, § 46, com. d, p. 73.)" (*Cochran,* at p. 496.)

In *Cochran,* the litigants were former romantic partners who had a son together, and whose relationship had become antagonistic. (*Cochran, supra,* 65 Cal.App.4th at pp. 491–492.) The defendant left a voicemail message stating he was going to give the daughter of his former partner (both of whom were plaintiffs) " ' "the Value Jet around the world vacation package. She can fly any time she wants to as soon as they start flying again. . . ." ' This message referred to the then recent crash of a Value Jet airliner in the Florida Everglades which killed all aboard." (*Id.* at p. 492.) "[F]or several years before" leaving the voicemail message, the defendant "made both general and specific threats against [the plaintiffs], including statements

7

such as 'You know how powerful I am,' 'you'll be sorry,' [and] he would have them watched and followed wherever they went." (*Id.* at p. 495.)

The Court of Appeal held the voicemail message did not constitute outrageous conduct: "To the extent the message . . . can be characterized as a threat, its meaning is hidden and lacking in immediacy." (*Cochran, supra,* 65 Cal.App.4th at p. 498.) The court noted the context was that "the parties to an intimate relationship gone bad were now feuding. Those feuds are often accompanied by an exchange of hostile unpleasantries which are intended to sting whoever sits at the delivery end. While the pain inflicted might be real, the tort of intentional infliction of emotional distress was never intended to remove all such barbs. To hold otherwise would needlessly congest our courts with trials for hurts both real and imagined which are best resolved elsewhere. [¶] There is no indication that respondent ever took any steps to either carry out his alleged threat or, at the least, make the threat appear more real. Without more, the 'Value Jet' message which respondent allegedly left is little more than the release of steam from the pressure cooker of the parties' ill will. As such, it is precisely what the Restatement had in mind when it excluded 'mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities' from the tort and referred to the need for a safety valve 'through which irascible tempers may blow off relatively harmless steam.' " (*Ibid.*)

Joseph argues this case is more akin to *Kiseskey v. Carpenters' Trust for So. California* (1983) 144 Cal.App.3d 222 (*Kiseskey*), in which agents of the defendant union called the plaintiff on three occasions and told him, " 'You are a no good son of a bitch and if you don't resign the agreement and get in set with the union, you'll be put in the hospital;' " " 'Rejoin the union or you might not live to regret it;' " and " 'Since you do not seem to be concerned

8

about your safety and well-being, maybe you will be concerned about the well-being of your life and children.' " (*Id.* at p. 229.) The Court of Appeal held these calls "constitute outrageous conduct intended to inflict emotional distress in order to compel behavior through threats of physical violence or death . . . ." (*Id.* at p. 230.)

We agree with the trial court that the anonymous letter does not constitute outrageous conduct. Unlike the phone calls in *Kiseskey,* the letter contains no direct threats of physical harm. To the contrary, the letter characterizes itself as "a cordial communication" and "a friendly notification" seeking to forestall an "escalating and ongoing feud." The letter states the author's position that the gunshots originated from Joseph's property, and asks Joseph to refrain from engaging in conduct against others and to police the conduct of individuals present on his property. Thus, the letter appears to seek to defuse potential conflict. To the extent implied threats are present in the letter, the threats are not immediate. The context of an ongoing family dispute, as in *Cochran*, supports construing the letter as, at most, "the release of steam from the pressure cooker of the parties' ill will." (*Cochran, supra,* 65 Cal.App.4th at p. 498.)

Joseph also relies on allegations regarding his susceptibility to emotional distress, to wit, his experience with his late spouse's depression, substance abuse, and eventual suicide in 2009; as well as allegations of Walter III's "history of extremely violent and deadly behavior, including life threatening violence." We note the letter does not reference or allude to Joseph's painful experiences with his late spouse, and Joseph does not allege Walter III's history of violence was directed at him or other family members. Considering these allegations in combination with the substance of the letter, the conduct was not extreme or outrageous. (See *Cochran, supra,* 65

9

Cal.App.4th at pp. 495–496 ["Assuming for discussion's sake alone that appellants have sufficiently alleged facts showing they were susceptible to emotional distress, ' "major outrage is still essential to the tort; and the mere fact that the actor knows that the other will regard the conduct as insulting, or will have his feelings hurts [sic], is not enough." ' "].)

II. *Aiding and Abetting Louisa's Breach of Fiduciary Duty*

"The elements of a claim for aiding and abetting a breach of fiduciary duty are: (1) a third party's breach of fiduciary duties owed to plaintiff; (2) defendant's actual knowledge of that breach of fiduciary duties; (3) substantial assistance or encouragement by defendant to the third party's breach; and (4) defendant's conduct was a substantial factor in causing harm to plaintiff. [Citations.] Some cases suggest a complaint must allege a fifth element—that the aider and abettor had the specific intent to facilitate the wrongful conduct." (*Nasrawi v. Buck Consultants LLC* (2014) 231 Cal.App.4th 328, 343.)

The 3AC and the 5AC both allege that Louisa, as trustee of the Trust, owes fiduciary duties to Joseph, who has a beneficial interest in the Trust. They further allege she breached those fiduciary duties by performing acts as trustee to benefit her personally, terminating Joseph from the Company, refusing to fund the subtrusts, and paying herself trustee fees. Finally, as relevant here, the 3AC and 5AC allege Walter III provided "encouragement and substantial assistance" and his actions "were a substantial factor in causing harm to [Joseph]."

When Defendants demurred to the 3AC, the trial court found sufficient allegations that Walter III provided substantial encouragement by being "the brains behind the plan to harm Joseph." A different bench officer ruled on Walter III's demurrer to the 5AC. This bench officer found the allegations as

10

to Walter III insufficient: "[Joseph] alleges Walter III is the chief advisor to Louisa and the self-described architect and 'brains.' Plaintiff alleges Walter III bragged that he had put together a plan for the Binswanger family and Silvio to transfer wealth to themselves and deprive Plaintiff [and others]. Although the Court previously found Plaintiff had alleged facts sufficient to show 'substantial encouragement,' the Court did not address the fourth element: defendant's conduct was a substantial factor in causing harm to plaintiff. Here, Plaintiff has not alleged how the conduct of . . . Walter III was a substantial factor in causing Plaintiff's harm."

As an initial matter, Joseph argues the trial court's order overruling Walter III's demurrer to the breach of fiduciary duty claim in the 3AC precluded the court from sustaining Walter III's demurrer as to that claim in the 5AC. Courts of Appeal are split on this issue. (Compare *Bennett v. Suncloud* (1997) 56 Cal.App.4th 91, 96–97 ["when Judge Finkel overruled the demurrer to the first, second, third, seventh, and ninth causes of action . . . , Judge Haber was foreclosed from rendering a new determination on the viability of those claims unless some new facts or circumstances were brought to his attention"]; with *Pavicich v. Santucci* (2000) 85 Cal.App.4th 382, 389 & fn. 3 ["[the defendant] was entirely within his rights to demur to the fifth cause of action of the first amended complaint and amended cross-complaint notwithstanding his prior unsuccessful efforts to demur to the fifth cause of action of the original complaint and cross-complaint"].) We need not weigh in on the issue because, as courts on both sides have found, our review is not impacted by any such error. (*Bennett,* at p. 97 ["[N]ow that the case is before this court, we are free to review both Judge Finkel's and Judge Haber's orders and render an opinion based on the correct rule of law. We are not required to sustain an erroneous trial court ruling because it came first."];

11

*Berg & Berg Enterprises, LLC v. Boyle* (2009) 178 Cal.App.4th 1020, 1036 ["[T]he role of this court entails review of the trial court's ruling, not its rationale. Thus, even if the trial court here were constrained by its prior rulings in its consideration of the grounds raised on demurrers to the third amended complaint, on review of the judgment, we are not so constrained and are free to render an opinion based on the correct rule of law."].)

In sustaining Walter III's demurrer to this claim in the 5AC, the trial court found Joseph failed to sufficiently allege Walter III's conduct was a substantial factor in Joseph's harm (an issue the trial court's order on the 3AC did not expressly consider). " '[C]ausation is an essential element of an aiding and abetting claim, i.e., plaintiff must show that the aider and abettor provided assistance that was a substantial factor in causing the harm suffered.' " (*American Master Lease LLC v. Idanta Partners, Ltd.* (2014) 225 Cal.App.4th 1451, 1476.) " '[T]he "substantial factor" test' [citation] . . . requires the plaintiff to 'show some substantial link or nexus between omission and injury.' " (*Tansavatdi v. City of Rancho Palos Verdes* (2023) 14 Cal.5th 639, 661.)

The 5AC alleges only generally that Walter III provided "strategic advice" to Louisa, with no allegations about what he advised her on. Walter III was not trustee of the Trust, nor did he have any governing authority in the Company. His alleged boast that he developed a plan against Joseph, Linda, and Linda's husband was not specific to any of the alleged breaches of fiduciary duty. Indeed, the 5AC identifies the planners of some of the alleged breaches as persons *other* than Walter III: Joseph's termination was planned by Louisa, Silvio, and Marie; and actions involving a workers compensation insurer were planned by Louisa and Silvio. Joseph's briefs on appeal fail to

12

explain how the allegations about Walter III satisfy the substantial factor element.

Joseph argues, in the alternative, leave to amend should have been granted. However, Joseph fails to explain or identify what he would add to an amended complaint. "[A]lthough we are required to decide ' "whether there is a reasonable possibility that the defect [in the complaint] can be cured by amendment[,] . . . [t]he burden of proving such reasonable possibility is squarely on the plaintiff" ' [citation] by 'show[ing] in what manner he can amend his complaint and how that amendment will change the legal effect of his pleading.' " (*LeBrun v. CBS Television Studios, Inc.* (2021) 68 Cal.App.5th 199, 212.) Accordingly, we affirm the order sustaining Walter III's demurrer to this cause of action without leave to amend.

III. *RICO*

In its order on Defendants' demurrer to the 3AC, the trial court sustained the demurrer without leave to amend as to Joseph's RICO causes of action. We affirm.

"RICO is contained in title 18 or the United States Code, sections 1961 through 1968. . . . [¶] Although RICO provides for a private cause of action in federal district court, the California Supreme Court has held that state courts have concurrent jurisdiction over RICO claims." (*Gervase v. Superior Court* (1995) 31 Cal.App.4th 1218, 1228–1229.) To establish a civil RICO claim, "[i]n general, . . . the plaintiff must prove that the defendant caused injury to the plaintiff's business or property by engaging in a pattern of racketeering activity in connection with an enterprise which affects interstate commerce." (*Gervase,* at p. 1232.)

The RICO statute provides that a " ' "[p]attern of racketeering activity" requires at least two acts of racketeering activity . . . .' " (*Gervase, supra,* 31

13

Cal.App.4th at pp. 1231–1232.) "For an act or omission to qualify as racketeering activity, it must be included in the list of activities set forth in title 18 United States Code section 1961(1). While that list is lengthy, it does not include every criminal or civil wrong a person or entity might commit, and excluded actions, no matter how grievous, cannot qualify as racketeering activity within the meaning of RICO. [Citation.] In addition, a common element of all actions included in the list is a requirement that the action be criminal in nature, that is, that it be chargeable, indictable, or punishable as a crime." (*Id*. at p. 1232.)

The 3AC alleges various acts that Joseph claims constitute eight different racketeering activities. Joseph's opening brief argues only cursorily that he alleged "the requisite predicate actions," and distinguishes one case relied on by Walter III below relating to one of the alleged acts of racketeering. Walter III's response brief goes through each alleged racketeering activity and argues, with citations to authority, that the alleged facts do not constitute the claimed criminal acts. For example, Joseph alleges Defendants committed robbery when they took valuables from the family safe after their mother's death. As Walter III argues, this allegation fails to establish the elements of robbery that the property was taken from the person or in the person's immediate presence, and was taken by means of force of fear. (Pen. Code, § 211.) Joseph also alleges the anonymous letter (see *ante,* part I.A) constitutes a threat involving murder. To constitute a predicate act, a threat involving murder must be "chargeable under State law." (18 U.S.C. § 1961(1).) Penal Code section 422, subdivision (a), provides criminal punishment for "Any person who willfully threatens to commit a crime which will result in death or great bodily injury to another person," where the threat "is so unequivocal, unconditional, immediate, and specific as

14

to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat . . . ." The letter plainly does not satisfy this requirement.

In his reply brief, Joseph provides no response to these arguments or to Walter III's other specific arguments regarding the remaining alleged acts of racketeering. "We need not analyze this issue further because '[i]t is not our responsibility to develop an appellant's argument.' " (*SI 59 LLC v. Variel Warner Ventures, LLC* (2018) 29 Cal.App.5th 146, 156.) " ' "[E]very brief should contain a legal argument with citation to authorities on the points made. If none is furnished on a particular point, the court may treat it as waived, and pass it without consideration." [Citation.] [¶] " 'It is the duty of [appellant's] counsel, not of the courts, "by argument and the citation of authorities to show that the claimed error exists." ' " (*Supervalu, Inc. v. Wexford Underwriting Managers, Inc.* (2009) 175 Cal.App.4th 64, 80–81.)

Because Joseph fails to establish he alleged facts constituting a pattern of racketeering, we affirm the trial court's order sustaining Walter III's demurrer as to the RICO claims. We need not and do not consider the parties' arguments on the remaining elements of the RICO claims.

## DISPOSITION

The judgment is affirmed.

SIMONS, J.

WE CONCUR:

JACKSON, P. J.


BURNS, J.


*Garaventa v. Binswanger* (A165750)

15