Filed 12/15/14  Williams v. Helper CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| MARILYN WILLIAMS, | D064230 |
| Cross-complainant and Respondent, | |
| v. | (Super. Ct. No. 37-2010-00091956-CU-PO-CTL) |
| CATHERINE HEPLER et al., | |
| Cross-defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of San Diego County, Lisa C. Schall, Judge.  Affirmed.

Donald R. Holben & Associates, Amelia A. McDermott, for Cross-defendants and Appellants.

Dunne & Dunne, Anthony James Dunne, for Cross-complainant and Respondent.

Frank Nihil died when he was 94 years old and had advanced Alzheimer's disease. He left three adult children, and 85-year-old Marilyn Williams with whom he had been in a marriage-type, intimate relationship for 25 years.  Frank's children sued Marilyn

alleging she exercised undue influence over his financial affairs.[1]  Marilyn cross-complained, seeking recovery for emotional distress caused by the children's refusal to permit her to see their father in the last six months of his life and to attend his funeral.

The jury found the children did not prove their claims against Marilyn, but returned a special verdict in Marilyn's favor against two of the children (Catherine Hepler and Mary Jagers, collectively Sisters) on Marilyn's claim for intentional infliction of emotional distress. The jury awarded Marilyn $323,700.

On appeal, the Sisters do not challenge the jury's findings that Marilyn did not exercise undue influence over their father.  They seek to reverse the judgment only on Marilyn's intentional infliction of emotional distress claim, contending the court erred in submitting this claim to the jury and that insufficient evidence supported the cause of action.  We reject these contentions and affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

The nature of appellants' contentions require that we set forth the evidentiary record in some detail.  Under well-settled law, we summarize the relevant facts in the light most favorable to the jury verdict, drawing all reasonable inferences in support of the jury's findings.  (*Wilson v. County of Orange* (2009) 169 Cal.App.4th 1185, 1188.)

Frank and his former wife had three children:  Catherine, Mary, and Timothy.  In 1956, Frank's family moved next door to Marilyn and her husband, and their three young

---

[1]    To avoid confusion, we use the parties' first names.

children.  Three years later, in 1959, Marilyn's husband died at an early age.  Marilyn never remarried, and raised her children on her own.  In 1983, Frank's wife died.

About one year later, in 1984, the two surviving neighbors, Frank and Marilyn, began a romantic relationship, and then made a decision to live together without getting married.[2]  At the time, Frank was 69 and Marilyn was 61.  Frank moved into Marilyn's home in April 1985 and then sold his house.  During the same year, Frank retired from his longtime job as the director of the March of Dimes.

During the next 24 years, Marilyn and Frank held themselves out as husband and wife.  They enjoyed a devoted, "idyllic" relationship, and actively engaged in many recreational activities.  They were "very much in love" and were affectionate with one another.  They "shared everything," and had many functions with their children and grandchildren.  The Sisters were aware of their close relationship.

Early on, Marilyn and Frank decided to keep their finances separate, including maintaining separate checking and savings accounts.  However, Frank (who had more financial resources) paid for various joint expenses, such as numerous vacations and some of the house expenses.  Frank also purchased cars for their joint use, and would put title to the vehicles in both of their names.

In the early 1990's, Frank purchased a home for his adult daughter Catherine to live.  She paid $500 monthly rent to Frank during the next 18 years.  Frank also

---

[2]     Marilyn testified they decided not to get married because it did not "seem important" because of their ages and she did not want to jeopardize her military pension benefits if the relationship was unsuccessful.

3

purchased a condominium for his adult son to live; his son paid a nominal monthly rent. Frank would regularly provide maintenance for these residences.

In 1995, Frank retained an estate attorney, Patricia Minola, to prepare updated estate documents, including a revocable trust. He told Minola that his adult children would need financial help and that Marilyn received a military pension and Social Security benefits. In the updated revocable trust, Frank appointed himself trustee and appointed his daughter Mary as his successor trustee. He provided that upon his death, Marilyn would receive a gift of $20,000, and his children would receive his remaining assets, including the residences in which Catherine and Timothy were living. Under the trust provisions, Frank had broad powers over his assets during his lifetime, and was conclusively presumed to be competent to exercise these rights, unless he was declared incompetent by two physicians.

Frank also executed a durable power of attorney for health care decisions, appointing Mary as his attorney-in-fact for these decisions. These powers included the authority to: (1) "make all necessary arrangements for me at any hospital, hospice, nursing home, convalescent home, . . . and to assure that all my essential needs are provided for at such a facility"; (2) "provide for such companionship for me as will meet my needs and preferences at a time when I am disabled or otherwise unable to arrange for such companionship myself"; and (3) "make advance arrangements for my funeral and burial or cremation . . . ." The document further states "all acts lawfully done by my attorney-in-fact hereunder are done with my consent and shall have the same validity and effect as if I were personally present and personally exercised the powers myself, and

4

shall inure to the benefit of and bind me, my estate, and my heirs, successors, assigns, and personal representatives."

Three years later, in 1998, Frank met with a new attorney, Joan Walsh, to amend certain provisions of his estate documents. In the amended documents, he appointed his daughter Catherine instead of Mary as his successor trustee, but he left unchanged the general nature of his estate distribution. He also executed a durable power of attorney, providing Catherine with his power of attorney upon his death or incapacity, including full powers to manage, sell, convey, and/or encumber his real and personal property. The power of attorney also gave Catherine the right (upon Frank's incapacity) to demand and receive all of Frank's personal and real property in which he "may have any interest."

In the early 2000's, Catherine was aware that Frank had about $350,000 in a checking account (for a limited time she was a coowner on the account), but Frank did not generally discuss his financial affairs with his daughters. Neither she nor Mary recalled discussing Frank's assets or trust with him after this time.

Marilyn was also unaware of the extent of Frank's financial assets during his lifetime. But she testified that Frank repeatedly told her he would "leave me a wealthy woman" upon his death. However, in May 2007, Frank told Marilyn he had not provided for her in his estate documents, and he wanted to make this up to her by giving her a gift

5

of $100,000 from his Schwab account.  There was evidence supporting that at the time Frank was fully competent and mentally functioning in a normal manner.[3]

To accomplish this gift, in about May 2007, Frank handwrote a letter to Schwab asking to withdraw the $100,000, but Schwab did not comply with this request (this letter was an exhibit at trial but was not included in the appellate record.)  Frank then sought the assistance of Marilyn's son Bruce (who is a mortgage banker in Massachusetts).  Frank told Bruce he did not want to change his estate plan, but wanted to give Marilyn the $100,000 and was "agitated" at Schwab's nonresponse.  Several months later, following Bruce's suggestions (and with Bruce's assistance), Frank and Marilyn opened a joint account at a bank and connected that account to Frank's Schwab funds through an online linkage account.  In September 2007, Frank transferred $100,000 from his Schwab account to the joint account.  Pursuant to Frank's express directions, Marilyn transferred the $100,000 to her own account.  At about the same time, Frank purchased a $50,000 certificate of deposit (CD) at La Jolla Bank, and named Marilyn as the beneficiary.

Neither Frank nor Marilyn informed Frank's children about these transactions, which was not unusual because Frank did not normally discuss his financial transactions with his family.

---

[3]     We disagree with the dissent's statement that it is "not in dispute" that in 2006 Frank started showing signs of Alzheimer's disease and vascular dementia.  The dissent relies on the testimony of the Sisters' expert witness, who never met or saw Frank, or spoke with Marilyn or the Sisters.  Based on the testimony of Marilyn and Frank's doctor, the jury had a reasonable basis to find that Frank was competent and understood what he was doing in 2006 and 2007.  The jury's finding that the Sisters did not prove their undue influence claim supports that the jury rejected the Sisters' factual assertions that Frank was mentally impaired in 2006 and 2007.

The next year, in February 2008, Frank's doctor, Dr. Joseph Ramsdell, diagnosed 91-year-old Frank with early dementia, and during the next year Frank's mental and physical health declined rapidly. By the end of 2008, Frank became incontinent, lost control of his bowels, and was unable to perform routine daily tasks. Marilyn was required to care for him on a 24-hour basis, including dressing, bathing, and feeding him. Frank also became physically and verbally abusive. Marilyn was his sole caretaker, but she did not mind caring for him because she "loved him and because he needed me, and I needed him even as he was. I was happy to be with him."

During this time, Marilyn created a joint bank account with Frank, and placed some of Frank's assets (approximately $40,000) in the account to pay for various joint expenses because Frank could not sign his own checks.

After about one year of caring for Frank, Marilyn was briefly hospitalized with a stroke, leaving her with a mild speech impediment and difficulty swallowing. When she returned from the hospital, the Sisters and Marilyn's daughter decided Marilyn was not capable of continuing to care for Frank at home, and that Frank should be placed in a care facility. Marilyn understood the decision, but was sad and upset.

Catherine and Marilyn's daughter then inquired about placing Frank at Active Care, a facility specializing in dementia patients. When they toured the facility, they told the executive director, Helen Patsiouras, that before they could select the facility, Marilyn would need to approve the placement.

Shortly after, Marilyn toured the Active Care facility and agreed that it would provide appropriate care for Frank. Frank was admitted in early September 2009.

7

Marilyn visited Frank every day. Director Patsiouras observed that Marilyn was "extremely dedicated" to Frank. When Marilyn would sit with him in the common room, they were always holding each other and touching, "very close, sort of a very intimate type of look." Frank would "light up" when she was there; and he appeared "very happy" to spend time with Marilyn. Marilyn would also take Frank out of the facility every day for several hours to visit local attractions, including Balboa Park and the beach areas. Frank "loved" those trips: "he beamed" and "was so appreciative." Director Patsiouras testified that sometimes Frank would not recognize Marilyn, but he would say "I know her. I love her."

At about this same time, Catherine learned she had been named successor trustee and had Frank's power of attorney. At the end of September 2009, Catherine met with Frank's estate attorney (Walsh). During the meeting Walsh explained Catherine's fiduciary duties as a successor trustee and attorney-in-fact, including to maintain all of Frank's assets, make certain that she had obtained all information about the assets, and take control of those assets.

Catherine then obtained letters from two doctors certifying that Frank was suffering from dementia and incapacitated from performing his trustee duties, which triggered Catherine's powers over Frank's finances. Pursuant to this authority and Walsh's instructions, Catherine located all of Frank's accounts, and was shocked and "astonished" that the value of the assets in one account was substantially reduced from 10 years earlier and was surprised to find there were joint accounts, when she had always understood that Frank was careful to keep his funds in separate accounts. Following

8

Walsh's directions, Catherine terminated Frank's and Marilyn's joint bank accounts, insurance policies and joint credit cards. Marilyn understood and was cooperative with these actions.

At a meeting with Walsh, Catherine discussed the status of Frank's bank accounts, and Walsh also noticed the value of Frank's assets had gone down since 1999. Walsh believed the joint accounts were inconsistent with Frank's earlier practice (10 years earlier) of strictly keeping his accounts separate from Marilyn's accounts.

At about this same time, Marilyn wrote Catherine a note stating: "Several years ago your dad had an attack of conscience, saying he hadn't provided for me as he'd promised—and so made me the beneficiary of La Jolla Bank CD [account number]." Marilyn said the interest earned from this CD had been transferred to Frank's and Marilyn's joint Union Bank account. In response, Catherine took possession of the joint account and the CD account. Catherine also discovered the $100,000 transfer from Frank's Schwab account to Marilyn, and Catherine became "very upset."

Shortly after learning of the $100,000 transfer and receiving Marilyn's "attack of conscience" note, Catherine told Patsiouras to "restrict Marilyn from visiting Frank." According to Patsiouras, Catherine was "adamant[ ] . . . that she wanted [Marilyn] not to be allowed to visit him any more." Catherine told Patsiouras that she believed Marilyn had been taking financial advantage of her father. Catherine said she had Frank's power of attorney and "that she decided that she just didn't want him receiving any visits from [Marilyn]; that they were not married and she was just a girlfriend . . . ." At trial,

9

Catherine acknowledged she made this request because she was "upset with [Marilyn]" after learning of the fund transfers and joint account.

Patsiouras testified that she responded to Catherine "that [the visit restriction] was absolutely not going to happen, that I was interested in Frank's well-being and since he had already indicated to me that [Marilyn] was somebody that he loved and felt deeply about, I was not going to restrict [Marilyn's] visits to the [facility]; that the most I would do is not allow Marilyn to take him out of the [facility] for their trips out to the park or restaurants . . . ."

The next day when Patsiouras informed Marilyn that she could no longer take Frank out for day trips, Marilyn was "stunned" and "heartbroken." According to Patsiouras, Marilyn "started tearing up" and said "she couldn't understand why Catherine was placing such a restriction on her, that [she and Frank] had been together . . . for a very long time, and she . . . felt that this was being done to punish her for some reason."

Marilyn nonetheless continued to visit Frank every day, even if she was not allowed to take him outside the facility. The last time she saw him was the next month, in the beginning of December 2009. At that time, without notice to Marilyn, Catherine moved him out of the facility, and refused Marilyn's requests for information as to Frank's whereabouts. Patsiouras testified that "[Marilyn] seemed like a lost soul . . . . She was beside herself. She was very upset." According to Patsiouras, Marilyn "didn't know why they had decided to move him. She felt that the care he was getting at our facility was very good for him, he was being well-cared for, and she was very concerned about where he would end up, and what kind of care he would receive."

10

Catherine did not provide the facility a specific reason for moving Frank out of the facility, other than to say she was going to take him home and care for him there. Patsiouras was "very surprised" because Catherine had previously told her that she had back problems and could not take care of Frank.

During the next six months, Frank had a series of placements. In summary, Frank first stayed with Catherine at her house, but after about five or six weeks Catherine became unable to handle him, and placed him in a home-type setting for people with dementia. However, after 11 days, he was involuntarily transferred out of this facility and put on a psychiatric hold in a hospital because of his anger issues. (Welf. & Inst. Code, § 5150.) After that, Catherine and her siblings placed Frank in another Alzheimer's care facility, but he lasted there only for a short time. He was then transferred to a hospital, where he died.

During this time, Marilyn made numerous efforts to contact Catherine, but Catherine "put a block on her phone barring any calls from [her] home." Marilyn also left notes at Catherine's home, telling her that she was "heartbroken"; "needed to see him"; "wanted to see him"; "was concerned for him"; was "desperate to see him"; and "was lost . . . without him." Marilyn left clothing and mementoes that she thought Frank would enjoy. Catherine never responded. Catherine testified that she and her siblings "decided that [Marilyn's visiting with Frank] wasn't in the best interests of my father."

Not knowing Frank's location or status, Marilyn became "distraught." She could not sleep because of her concern for him. She was prescribed sedatives, but they did not work. She was concerned about his "well-being, whether he missed me, whether he was

11

. . . distraught, whether he would still know me, how well he was being treated, how well his needs were being met." She testified, for example, that Frank needed daily care for several severe skin problems on his feet and his groin that required daily treatment, and she was concerned that he was not getting this care. She said she constantly worried about him: "We'd been together 25 years . . . we cared for one another and I cared for him, met his needs and his wants." She said that it was not Frank's plan to be separated from her for the last nine months of his life because "we were devoted to one another. He needed me. He depended on me. He loved me, and I had all of those same needs as he did."

At that point, her physician diagnosed her with depression and prescribed medication. Marilyn consulted with an attorney, but decided not to file for a conservatorship because "[a]ll I wanted to do was see him. I had no desire to take control away from Catherine; had no desire to do anything but see Frank."

Marilyn also considered suicide. She said that although she never drinks alcohol, she purchased a bottle of wine and considered taking the wine with Valium because she had heard that this can cause death. She also thought about killing herself by turning off the freeway while she was driving. Her son testified that she told him that she had contemplated committing suicide and that she had the equipment to do it.

Frank died on June 24.

About five days later, one of Mary's daughters called Marilyn and told her of Frank's death. Marilyn testified she felt "Shock. Devastated. Alone." Her insomnia became worse. She said she mourned his death, but also that she had not been able to see

him before his death.  She said she still feels the pain of the separation, and "the fact that the girls denied me" access to Frank.  She said she can't "overcome the loss and the . . . cruelty and the viciousness . . . [a]nd the fact that if Frank needed me, I wasn't there.  The fact that he was moved from place to place.  Each one must have been more disorienting than the other."  She continues to grieve "constantly" because she was unable to see Frank the last six months of his life.

The funeral was held about two months after Frank's death in late August 2010.  Catherine and Mary testified they made a decision not to inform Marilyn of the funeral date.  Catherine explained that there were bad feelings between the family and Marilyn, and "It would have been very disturbing to the rest of my family if she had come."  Catherine said she did not believe Marilyn deserved to be at the funeral "[a]fter what she did to my father . . . .  This was a man [who] worked very, very hard for all that he earned.  He grew up in poverty, and he . . . became a successful business person.  As soon as she saw some weakness in him, then funds were missing, money was missing and moved around.  This is not what my father wanted."

Both Mary and Catherine testified the funeral was a "beautiful ceremony," and it helped them feel peaceful and calm about their father's death.  Marilyn testified she was not invited and "didn't know there was a funeral until after the fact when my neighbors informed me."  She felt humiliated because her neighbors "are privy to my business and it makes me very uncomfortable.  My neighbors attended the funeral that I didn't know about.  . . . [T]hey can't help but talk and speculate."  She testified "I should have been there.  He was part of my life.  I was part of his life for 55 years."

At the time of his death, Frank had cash of $233,000. This amount did not include the $100,000 given to Marilyn from the Schwab account, but included all the other funds in Frank's separate accounts and the couple's joint accounts, including the $50,000 CD. Frank also owned two parcels of real estate (the home where Catherine lived and the condominium where Timothy lived). According to Catherine, the home was worth about $245,000 and the condominium was valued at about $90,000.

*Complaint and Cross-complaint*

One month before Frank died, Catherine (individually and as trustee of Frank's trust), Mary, and Timothy filed a complaint against Marilyn alleging undue influence, breach of fiduciary duty, financial elder abuse, constructive fraud, conversion, and rescission and restitution. They alleged that during the 2000's, Frank experienced declining mental health and was vulnerable to influence, and that Marilyn took advantage of his disabilities to divest "more than $800,000" from Frank.

About one month after Frank's funeral, Marilyn cross-complained against Frank's three children, alleging intentional infliction of emotional distress, negligence, elder abuse, and slander. Marilyn's only cause of action presented to the jury was her intentional infliction claim against the Sisters.[4] On this claim, Marilyn alleged the Sisters prevented her from access to, or contact with, Frank, despite that they were aware of her emotional reliance on Frank and her vulnerable medical condition (her recent

---

[4] At the conclusion of the evidence, the court granted a nonsuit on Marilyn's claims against Frank's son Timothy, and also on Marilyn's slander cause of action against all cross-defendants. The other claims had been dismissed prior to trial.

14

stroke).  She alleged the Sisters' conduct was "intentional and malicious and done for the purpose of causing [her] to suffer humiliation, mental anguish, and emotional and physical distress."  Marilyn alleged the Sisters' conduct caused her to suffer emotional and physical distress, including clinical depression, because "she was not able to visit her life partner or see him before he passed away."

*Trial*

At trial, Marilyn presented the evidence summarized above.  She testified at length about her forced separation from Frank and the devastating emotional impact it had on her life.  She testified that Frank was devoted to his adult children, but also presented evidence that the only funds she received from Frank was the $100,000 gift, and that Frank was fully competent when he transferred these funds to her as a gift.

In their testimony, the Sisters conceded they made deliberate decisions to prevent Marilyn from seeing Frank after early December 2009 and to preclude her from coming to the funeral.  They stated these actions were in response to their learning that Marilyn had transferred substantial funds from Frank's separate account to joint accounts or her own account.  Although they alleged in their complaint that Marilyn took $800,000 from their father, their counsel acknowledged at trial that Marilyn received only $100,000 of their father's money.

At her deposition, Mary was asked whether the decision to keep Marilyn away from Frank was made as a kind of "tit-for-tat kind of scenario," and she responded that she "believed it was justice."  At trial, Mary testified she believed "Marilyn abused dad financially" and therefore wanted to protect him because he would have considered

15

Marilyn's conduct "a betrayal." Mary explained that she and her siblings did not want to "reward somebody that did an injury to my dad" and "didn't want to have extra people seeing him or people we thought had already hurt him."

Catherine testified that after she reviewed the Schwab statement in 2009 showing the $100,000 transfer she became concerned that a "vast amount" of her father's estate was gone. She said she believed she made the right decision to prevent Marilyn from seeing Frank because Marilyn "hurt my father. And really, it was . . . just appalling. How she could treat him after 25 years of living [with him] . . . . [¶] . . . [¶] . . . I just didn't want her taking him out and having any undue influence upon my father . . . ." Catherine testified it was "very emotional to find out about my dad's investments and the other things that he had. That was very hurtful to him because . . . [m]oney didn't come easily to him. [¶] . . . [¶] And now, that to think that his wishes were not abided by, I think it's totally wrong."

*Jury Instructions and Argument*

At the conclusion of the evidence, the court denied the Sisters' motion for nonsuit on the intentional infliction of emotional distress claim. The court found that Marilyn presented sufficient evidence to support her claims that the Sisters acted in an outrageous manner and intentionally caused Marilyn severe emotional distress, and that their conduct was not privileged.

Pursuant to the Sisters' request, the court used the CACI model instructions to instruct the jury on the intentional infliction of emotional distress claim. These

16

instructions identified the essential elements of the tort[5] and the definition of "outrageous conduct"[6]. Over Marilyn's objections and pursuant to the Sisters' request, the court also gave the jury a CACI instruction on the privilege defense barring recovery when the defendant was exercising his or her economic or legal rights in a lawful manner.[7] The court additionally instructed the jury on a qualification to this privilege when the actor

---

[5] This instruction read: "Ms. Williams claims that Catherine Hepler and Mary Jagers' conduct caused her to suffer severe emotional distress. To establish this claim, Marilyn Williams must prove all of the following. [¶] 1. That Catherine Hepler and/or Mary Jagers' conduct was outrageous; [¶] 2. That Catherine Hepler and/or Mary Jagers intended to cause Marilyn Williams emotional distress; [¶] 3. That Marilyn Williams suffered severe emotional distress; and [¶] 4. That Catherine Hepler and/or Mary Jagers conduct was a substantial factor in causing Marilyn Williams severe emotional distress." (See CACI No. 1600, italics omitted.)

[6] This instruction read: " 'Outrageous conduct' is conduct so extreme that it goes beyond all possible bounds of decency. Conduct is outrageous if a reasonable person would regard the conduct as intolerable in a civilized community. Outrageous conduct does not include trivialities such as indignities, annoyances, hurt feelings, or bad manners that a reasonable person is expected to endure. [¶] In deciding whether Catherine Hepler and/or Mary Jagers' conduct was outrageous, you may consider, among other factors, the following: [¶] (a) Whether Catherine Hepler and/or Mary Jagers abused a position of authority or a relationship that gave them real or apparent power to affect Marilyn Williams interests; [¶] (b) Whether Catherine Hepler and/or Mary Jagers knew that Marilyn Williams was particularly vulnerable to emotional distress; and [¶] (c) Whether Catherine Hepler and/or Mary Jagers knew that their conduct would likely result in harm due to mental distress." (See CACI No. 1602, italics omitted.)

[7] This instruction read: "Catherine Hepler and Mary Jagers claim that they are not responsible for Marilyn Williams harm, if any, because their conduct was permissible. To succeed, Catherine Hepler and Mary Jagers must prove all of the following: [¶] 1. That Catherine Hepler and Mary Jagers were exercising their legal right to protect their father or that they were protecting their economic interests; [¶] 2. That Catherine Hepler and Mary Jagers conduct was lawful and consistent with community standards; and [¶] 3. That Catherine Hepler and Mary Jagers had a good-faith belief that they had a legal right to engage in the conduct. [¶] If you find all of the above, Catherine Hepler and Mary Jagers's conduct was permissible." (See CACI No. 1605, italics omitted.)

17

did not have a good faith belief in the existence of the rights and/or exercised his or her rights in an outrageous *manner*.[8]

During his closing argument, the Sisters' counsel focused on the $100,000 that Frank transferred from his Schwab account and argued that Marilyn "used undue influence to obtain the $100,000 from Frank.  That's it.  That's the whole case."  Counsel argued that given this wrongful act, the Sisters could not be held liable for the intentional infliction tort because they were acting within their legal rights in "trying to protect Frank."  He said the Sisters were "concerned about what would happen if Marilyn . . . was allowed to take Frank out of the facility, potentially to a bank, or even see him and give him other documents to sign.  So were they acting to protect Frank?  Yeah.  And in a way, they were working to protect themselves. . . ."  Counsel emphasized that under her power of attorney, Catherine had the "right and authority to determine who her father could see, what facilities he was being kept in.  [The power of attorney form] says right there in black and white.  [¶]  This is almost like Frank made the decision himself.  That is the whole purpose of the power of attorney."  He further argued:

> "Were [Catherine's actions] consistent with community standards?
> Every child should take care of their parent, so yes.  [¶]  And did
> Catherine Hepler have a good faith belief that she had a legal right to
> engage in the conduct?  Of course she did.  She believed the father
> was being stolen from.  She believed his memory was being
> dishonored.  [¶] And thus was her conduct outrageous?  No.  No it

---

[8]     This instruction read:  "Nevertheless the exercise of the privilege to assert one's legal rights must be done in a permissible way and with good faith belief in the existence of the rights asserted.  One who acts in an outrageous manner may be held liable for intentional infliction of emotional distress."

wasn't. She was protecting her father and protecting her family and protecting herself. And you actually don't need to go any further than that."

In Marilyn's counsel's closing argument, counsel countered that this case is not about Marilyn taking $100,0000 and instead it "is about a claim by [the Sisters] that there wasn't enough money left for them when their dad died because he decided to share some of it, a fairly small portion of it, with the woman that he loved for 25 years. [¶] [W]hat [the Sisters' counsel] failed to address with you is the fact that in the most vicious and uncalled for, and with the worst motives and conduct, they took Frank and ripped him apart from Marilyn until he died." In response to the Sisters' claims that their conduct was privileged, Marilyn's counsel argued that this defense applies only if they had "a good faith belief that they were actually doing something they were privileged to do and had a legal right to do" and if the manner in which they acted was not outrageous. Marilyn's counsel concluded by noting that if they wanted to protect Frank's financial interests:

> "There's a lot of ways they could have done that. . . . Catherine came in and took all of the accounts over. . . . She had letters saying that her dad was incapacitated . . . . He was no longer capable of opening a bank account at that point. No one would let him do it. She was in control of everything.

> "Why did she separate Frank and Marilyn? Because she wanted to punish Marilyn. For what? For what she said was 'She figured that if there was money gone, Marilyn had to be the one to take it.' They got what they wanted. Marilyn has suffered severe emotional distress. She's thought about killing herself. She's had depression. She lays awake every single night unable to sleep, missing Frank, knowing that she never got to say goodbye . . . ."

19

*Jury Verdict*

After deliberating for only about two hours, the jury unanimously returned a special verdict against the Sisters on their undue influence (and related) claims and in favor of Marilyn on her claim for intentional infliction of emotional distress. On Marilyn's intentional infliction of emotional distress claim against Catherine, the jury's verdict form read:

"21. Was Catherine Hepler exercising her legal rights or protecting her economic interests?

"___✓___Yes _____ No

"If your answer to question 21 is 'Yes,' then answer question 22. If you answered no, skip questions 22 and 23 and answer question 24.

"22. Was Catherine Hepler's conduct lawful and consistent with community standards?

"_____Yes __✓__ No

"If your answer to question 22 is 'Yes,' then answer question 23. If you answered 'No,' skip question 23 and answer question 24.

"23. Did Catherine Hepler have a good-faith belief that she had a legal right to engage in the conduct?

"_____Yes _____ No

"If your answer to question 23 is 'No,' then answer question 24. If you answered 'Yes,' please skip to question 29.

"24. Was Catherine Hepler's conduct outrageous?

"__✓__Yes _____ No

"If your answer to question 24 is 'Yes,' then answer question 25. If you answered 'No,' please skip to question 29.

20

"25. Did Catherine Hepler intend to cause Marilyn Williams emotional distress?

"___✓___Yes _____ No

"If your answer to question 25 is 'Yes,' then answer question 26. If you answered 'No,' please skip to question 29.

"26. Did Marilyn Williams suffer severe emotional distress?

"___✓___Yes _____ No

"If your answer to question 26 is 'Yes,' then answer question 27. If you answered 'No,' please skip to question 29.

"27. Was Catherine Hepler's conduct a substantial factor in causing Marilyn Williams's severe emotional distress?

"___✓___Yes _____ No

"If your answer to question 27 is 'Yes,' then answer question 28. If you answered 'No,' please skip to question 29.

"28. Has Marilyn Williams proved by clear and convincing evidence that Catherine Hepler acted with malice, oppression, or fraud?

"___✓___Yes _____ No"

The jury answered the same way to the identical questions regarding cross-defendant Mary. With respect to both Sisters, the jury found Marilyn's damages for past noneconomic loss were $223,700 and her damages for future noneconomic loss were $100,000.

Although the jury found that Marilyn had proved by "clear and convincing evidence" that both Sisters acted with "malice, oppression, or fraud," Marilyn dismissed her punitive damages claim after the jury returned its verdict.

21

DISCUSSION

The Sisters do not challenge the jury's finding that they did not prove their undue influence/conversion claims against Marilyn. Nor do they raise legal challenges to the court's evidentiary rulings, jury instructions, or verdict form regarding the intentional infliction of emotional distress claim. Instead, their sole appellate contention is that the court erred in submitting the emotional distress claim to the jury and/or that insufficient evidence supported the jury's factual findings. For the reasons explained below, we reject this contention.

## I. *Generally Applicable Law*

To prevail on an intentional infliction of emotional distress cause of action, a plaintiff is required to prove: " ' "(1) outrageous conduct by the defendant, (2) intention to cause or reckless disregard of the probability of causing emotional distress, (3) severe emotional suffering and (4) actual and proximate causation of the emotional distress." ' [Citation.]" (*Wong v. Jing* (2010) 189 Cal.App.4th 1354, 1376.) Economic or legal privilege is a defense to this tort under certain circumstances. A person is privileged to pursue his or her own legal or economic interests even if the person knows the actions will cause another person emotional distress, but "the exercise of the privilege . . . must be done in a permissible way and with a good faith belief in the existence of the rights asserted." (*Fletcher v. Western National Life Ins. Co.* (1970) 10 Cal.App.3d 376, 395 (*Fletcher*).)

In evaluating the Sisters' challenges to the jury's findings on these issues, we apply well-settled review principles. " ' "When a finding of fact is attacked on the ground that

there is not any substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether there is any substantial evidence contradicted or uncontradicted which will support the finding of fact." ' [Citation.] 'An appellate court " 'must *presume* that the record contains evidence to support every finding of fact . . . .' " [Citations.] It is the appellant's burden . . . to identify and establish deficiencies in the evidence. [Citation.] This burden is a "daunting" one.' [Citation.]" (*Holguin v. DISH Network LLC* (2014) 229 Cal.App.4th 1310, 1326; accord, *Plotnik v. Meihaus* (2012) 208 Cal.App.4th 1590, 1600 (*Plotnik*).)

" 'In reviewing the evidence, we resolve all conflicts in favor of the party prevailing at the trial court level and must give that party the benefit of every reasonable inference in support of the judgment. " ' "When more than one inference can be reasonably deduced from the facts, the appellate court cannot substitute its deductions for those of the superior court." ' " ' [Citations.] 'Substantial evidence' is relevant evidence that a reasonable mind might accept as adequate to support a conclusion. [Citation.] It is sufficient ' "if any reasonable trier of fact could have considered it reasonable, credible and of solid value." ' [Citation.]" (*San Diego Unified School Dist. v. Commission on Professional Competence* (2013) 214 Cal.App.4th 1120, 1141-1142; see *Plotnik, supra*, 208 Cal.App.4th at pp. 1600-1601; *Conservatorship of Amanda B.* (2007) 149 Cal.App.4th 342, 347-348.)

Applying these appellate rules, we evaluate the Sisters' contentions that there was insufficient evidence to support that: (1) their actions were "outrageous"; (2) their

23

conduct was not privileged; (3) their conduct was directed at Marilyn; and (4) Marilyn suffered past and future emotional distress damages of $323,700.

## II. *Outrageous Conduct*

### A. *Legal Principles*

To satisfy the "outrageous" element of the tort, the defendant's conduct must have been " ' " 'so extreme as to exceed all bounds of that usually tolerated in a civilized community' " '. . . and . . .' "of a nature which is especially calculated to cause, and does cause, mental distress." ' [Citation.]" (*Chang v. Lederman* (2009) 172 Cal.App.4th 67, 86-87.) "Liability . . . ' "does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." [Citation.]' " (*Hughes v. Pair* (2009) 46 Cal.4th 1035, 1051.) It is " 'not . . . enough that the defendant has acted with an intent which is tortious or even criminal . . . or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.' " (*Cochran v. Cochran* (1998) 65 Cal.App.4th 488, 496.)

It is " ' "for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery." ' " (*Fowler v. Varian Assocs., Inc.* (1987) 196 Cal.App.3d 34, 44 (*Fowler*).) Once the court finds the alleged conduct satisfies this standard, "outrageousness is a question of fact." (*Spinks v. Equity Residential Briarwood Apartments* (2009) 171

24

Cal.App.4th 1004, 1045 (*Spinks*); accord *So v. Shin* (2013) 212 Cal.App.4th 652, 672.) " 'There is no bright line standard for judging outrageous conduct and " '. . . its generality hazards a case-by-case appraisal of conduct filtered through the prism of the appraiser's values, sensitivity threshold, and standards of civility. The process evoked by the test appears to be more intuitive than analytical . . . .' [Citation.]" ' " (*So, supra*, 212 Cal.App.4th at p. 671; *KOVR-TV*, *Inc. v. Superior Court* (1995) 31 Cal.App.4th 1023, 1028.)

Under these authorities, a plaintiff must overcome a high bar to establish a defendant acted in a sufficiently egregious manner to recover on an intentional infliction of emotional distress claim. However, the courts have recognized certain factors that increase the likelihood that a defendant's conduct will be viewed as outrageous. Of particular relevance here, the courts have upheld recovery for the tort in contexts when one actor has an unequal power over the other, particularly where the defendant has special knowledge that the plaintiff is vulnerable and has no way to protect himself or herself. (See *Agarwal v. Johnson* (1979) 25 Cal.3d 932, 946-947; *Alcorn v. Anbro Engineering, Inc.* (1970) 2 Cal.3d 483, 498, fn. 2; *Spinks, supra*, 171 Cal.App.4th at p. 1046.) "Behavior may be considered outrageous if a defendant (1) abuses a relation or position which gives him power to damage the plaintiff's interest; (2) knows the plaintiff is susceptible to injuries through mental distress; or (3) acts intentionally or unreasonably with the recognition that the acts are likely to result in illness through mental distress." (*Agarwal v. Johnson, supra*, 25 Cal.3d at p. 946; *Hailey v. California Physicians' Service* (2007) 158 Cal.App.4th 452, 474.) " ' " [T]he extreme and outrageous character of the

25

conduct may arise from an abuse by the actor of a position, or a relation with the other, which gives him actual or apparent authority over the other, or power to affect his interests. . . . [¶] . . . [And] [t]he conduct may become heartless, flagrant, and outrageous when the actor proceeds in the face of such knowledge, where it would not be so if he did not know.' " ' [Citation.]" (*Hailey, supra*, 158 Cal.App.4th at p. 474.)

B. *Analysis*

Marilyn presented evidence showing that at the time the Sisters denied her the ability to see Frank, the Sisters knew of their father's extremely close and loving 25-year relationship with Marilyn. They also knew that Marilyn, who was in her 80's and had recently suffered a stroke, was emotionally dependent on her caretaking role for Frank and had been his sole caretaker for a lengthy period. They were also aware that Marilyn had no legal or practical ability to interfere with Frank's finances because Catherine had taken over as successor trustee and all of the financial institutions had been notified of this fact. The evidence also shows that Marilyn communicated to Catherine that she had become emotionally devastated by her inability to see and care for Frank. Further, the Sisters' conduct was not a momentary lapse, and instead was the product of deliberation and discussion that continued over a nine-month period (from the time the Sisters refused to disclose Frank's whereabouts through the time of Frank's funeral).

Viewing this evidence in the light most favorable to Marilyn, the record supports that the Sisters made the decision to preclude Marilyn from seeing their father and from attending the funeral to punish her for her actions that reduced the value of their inheritance, and that they were fully aware of the devastating impact the physical

26

separation had on Marilyn.  A reasonable person could find this conduct exceeded the bounds of conduct expected in a civilized society.  The fact there was evidence supporting the specific factors that the jury was instructed it could consider in assessing outrageousness—abuse of position of authority and knowledge of vulnerability—supports this conclusion and we cannot say, as a matter of law, the jury's verdict was erroneous.

For similar reasons, we determine the court did not err in denying the Sisters' nonsuit motion on the intentional infliction claim.  The trial court serves a gatekeeper function to ensure that the alleged conduct is sufficiently outrageous before allowing a jury to reach determinations on the issues.  (*Chang v. Lederman, supra*, 172 Cal.App.4th at p. 87; *Fowler, supra*, 196 Cal.App.3d at p. 44.)  This rule recognizes the difficulty of drawing concrete rules for the emotional distress tort and ensures that only legitimate and genuine claims are presented to the jury.  If the court decides that reasonable persons may differ on the issue, then "it is for the jury to determine whether the conduct was, in fact, outrageous."  (*Berkley v. Dowds* (2007) 152 Cal.App.4th 518, 534.)

The evidentiary record supported the court's conclusion that the Sisters' intentional conduct was sufficiently extreme and outrageous to warrant the jury's consideration.  Marilyn presented evidence that the Sisters intentionally prevented her from having any contact with her life partner while he was terminally ill and in severe mental distress.  At the time, the Sisters knew of the intensely close relationship between Marilyn and Frank, that Marilyn no longer had any power to affect Frank's financial status, and that Marilyn was an elderly woman who was highly vulnerable under the circumstances.  The

27

evidence also disclosed that the Sisters were aware that Marilyn was providing a highly beneficial caretaking role while Frank was in the nursing home, and by terminating contact, they not only deprived Marilyn of the essential comfort she derived from caring for her dying partner, but they also deprived Frank of this critical love and support in his final days. Under the circumstances, the court did not err in denying the nonsuit motion and allowing the jury to decide the outrageousness issue.

Quoting the Restatement of Torts, the Sisters argue that a plaintiff " 'must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind. There is no occasion for the law to intervene where some one's feelings are hurt. There must still be freedom to express an unflattering opinion, and some safety valve must be left through which irascible tempers may blow off relatively harmless steam.' " (See Rest.2d Torts, § 46, com. d.) We agree with these principles, but a reasonable factfinder could find the Sisters' conduct was certainly more than " 'rough language' " or occasional " 'inconsiderate' " or " 'unkind' " acts. Both the court and the jury had a reasonable basis to find that the actions in keeping Marilyn away from their dying father (while he was moved to and from various facilities) were cruel and unnecessary, and that the Sisters' conduct went well beyond all bounds of decency.

The Sisters' additional arguments are based on factual inferences drawn in their favor. For example, they argue the decision to remove Frank from Active Care was not outrageous because it was solely a reaction to an incident where Frank fell out of his wheelchair and the staff had not noticed this incident. The jury had a reasonable basis to

28

reject this argument as director Patsiouras testified that Catherine never gave her any reason for removing Frank and there was other evidence showing he was receiving excellent care at this facility. Moreover, both Catherine and Mary *admitted* they made the affirmative decision to preclude Marilyn from seeing their father in reaction to their learning that he had transferred funds to Marilyn and/or opened joint bank accounts with her.

We likewise reject the Sisters' argument that limiting Marilyn's access to Frank was not outrageous because it was a reasonable action to preclude Marilyn from continuing to exercise undue influence over their Father. Although the jury could have accepted this version of the evidence, they were not required to do so. As Marilyn's counsel noted during his closing statements, by about October 2009, Catherine had obtained the authority to exercise power of attorney over Frank's accounts and had notified the financial institutions of her father's incompetency. Thus, there was no practical way that Marilyn could interfere with Frank's finances, particularly when Catherine had restricted her from taking him out of the facility. Marilyn testified that at the time she made clear that she desired only to have contact with Frank and to provide loving care to him, and did not want or intend to exert any control over Frank's finances. The jury was entitled to find Marilyn credible and determine that the Sisters' asserted justifications—that they wanted to "protect" their father or they thought they were merely carrying out their father's wishes—were pretextual and unnecessary given Catherine's sole legal and practical control over Frank's finances and given their knowledge of the closeness of the relationship between Marilyn and Frank.

Likewise, the Sisters' argument that they did nothing "affirmative" to prevent Marilyn from seeing Frank and coming to the funeral is inconsistent with the Sisters' admissions in their trial testimony that they made these affirmative decisions because they were angry at and upset with Marilyn. The Sisters argue that they did nothing to stop Marilyn from finding out independently about the date, time and location of the funeral. However, Marilyn specifically testified she did not know about the funeral until her neighbors told her *after the funeral took place.* The fact that another person could have obtained this information independently did not preclude the jury from concluding it was the Sisters' conduct that prevented this elderly woman from knowing about the funeral. Marilyn and Frank were not members of the religious institution that conducted the funeral services and there was no evidence that Marilyn had independent means of discovering the information. The Sisters testified that they made a deliberate decision to keep her away from the funeral. The jury was entitled to credit this evidence.

Viewing the factual record in its entirety, the evidence supported that the Sisters' entire course of action was sufficiently "outrageous" to permit recovery on Marilyn's intentional infliction of emotional distress claim.

### III. *Privilege Defense*

The Sisters alternatively argue their conduct was privileged as a matter of law because Catherine was acting under her trustee and attorney-in-fact powers to ensure Frank's finances were protected and to ensure Frank received quality healthcare.

If a party acts in good faith to pursue his or her own legal rights, this conduct is privileged, even if the party knows emotional distress will result. (*Ross v. Creel Printing*

30

*& Publishing Co., Inc.* (2002) 100 Cal.App.4th 736, 745, fn. 4; *Fletcher, supra*, 10 Cal.App.3d at p. 395.) Upon the Sisters' request, the court instructed the jury on this privilege using the model instruction, CACI No. 1605. (See fn. 7, *ante*.)

Under CACI No. 1605, the jury was told the elements of the privilege claim are as follows: (1) the Sisters "were exercising their legal right to protect their father" or to "protect[ ] their economic interests"; (2) the Sisters' conduct was "lawful and consistent with community standards"; and (3) the Sisters "had a good faith belief that they had a legal right to engage in the conduct." The court also instructed the jury the Sisters' conduct was permissible *only* if the jury found "*all of the above*." (Italics added.) The court further instructed the jury that the privilege to assert one's legal rights "must be done in a permissible way and with good faith belief in the existence of the rights asserted. One who acts in an outrageous manner may be held liable for intentional infliction of emotional distress."

In its special verdict, the jury found the Sisters *were* exercising their legal rights or protecting their economic interests when engaging in the challenged activities, but the Sisters' conduct was not "lawful *and consistent with community standards*." (Italics added.) According to the express directions in the verdict form, the jury did not reach the third question regarding the Sisters' good faith beliefs. But in a different section of the verdict form, the jury found (by clear and convincing evidence) that the Sisters acted "with malice, oppression, or fraud."

The Sisters argue there was insufficient evidence to support the finding that their conduct was not lawful and consistent with community standards, particularly given the

31

jury's finding that they were acting in pursuit of their legal or economic rights. We are unpersuaded. Although Catherine, as trustee and attorney-in-fact, had the right to make healthcare, personal, and financial decisions for Frank, the jury had a reasonable basis to find that the manner in which she and her sister exercised these powers went far beyond acceptable conduct and was not consistent with "community standards."

Marilyn presented substantial evidence showing that to the extent the Sisters had legal rights to manage their father's health care and financial decisions, these rights did not reasonably encompass the right to act cruelly towards their father's long-term partner, who was elderly, vulnerable, and no longer had any ability to affect their father's financial decisions and had manifested a commendable ability to provide comfort and respite care to their ailing father. Based on the jury instructions (which the Sisters do not challenge) and the evidence presented, the jury had a reasonable basis to find that the asserted legal privilege did not bar Marilyn's claims.

IV. *Intent To Cause Emotional Distress*

The Sisters next contend that there was no evidence supporting that their conduct was " 'directed at' " Marilyn, and instead "the undisputed evidence at trial established that [their] concern was (1) protecting their father from what they believed to be financial elder abuse and (2) preserving the sanctity of his funeral."

Generally, to recover for intentional infliction of emotional distress, the conduct must be specifically directed at the plaintiff. (See *Potter v. Firestone Tire & Rubber Co.* (1993) 6 Cal.4th 965, 1002.) However, the Sisters' argument that the evidence did not support this element is based solely on the Sisters' version of the evidence. They say the

32

"uncontradicted testimony shows" that their "conduct was intended to first protect Frank from someone that they believe had done him wrong and taken his assets and, second, to protect the family from the pain and emotion of having to deal with this person at the funeral."

Although the jury could have accepted these arguments, it was not required to do so. Viewing the facts in the light most favorable to Marilyn, the evidence supported that the Sisters acted to prevent Marilyn from seeing their father or attending the funeral primarily because they were angry at Marilyn and wanted to punish her because their inheritance was substantially less than what they expected. Additionally, Marilyn's evidence showed that the Sisters knew about the close emotional ties between Marilyn and Frank, the fact that Marilyn viewed her caregiving role as extremely important, and the fact that Marilyn was elderly and vulnerable. On this record, we reject the Sisters' argument that "No evidence was presented at trial that [their] conduct was intended to cause [Marilyn] severe emotional distress." Moreover, malicious or evil purpose is not essential to liability. (*Spinks, supra*, 171 Cal.App.4th at p. 1045; *KOVR-TV, Inc. v. Superior Court, supra*, 31 Cal.App.4th at p. 1031.) The fact that the Sisters admitted they took action against Marilyn because they were upset and angry is sufficient to satisfy the "specifically directed at the plaintiff" element of the intentional infliction tort.

## V. *Damages Award*

The Sisters contend the compensatory damages award must be reversed because the amount was excessive and "based on the passions and prejudice of the jury rather than on sober judgment."

33

The argument is waived. It is well settled the issue of excessive damages cannot be raised for the first time on appeal, and instead must be presented initially to the trial court on a new trial motion. (*Schroeder v. Auto Driveaway Co.* (1974) 11 Cal.3d 908, 918; *Jamison v. Jamison* (2008) 164 Cal.App.4th 714, 719-720; *Glendale Fed. Sav. & Loan Assn. v. Marina View Heights Dev. Co.* (1977) 66 Cal.App.3d 101, 122.) " 'The theory is that trial courts are in a better position than appellate courts to resolve disputes over the proper amount of damages. . . .' '. . . The power to weigh the evidence and resolve issues of credibility is vested in the trial court, not the reviewing court. [Citation.] . . . [A] party who first challenges the damage award on appeal, without a motion for a new trial, unnecessarily burdens the appellate court with issues that can and should be resolved at the trial level.' " (*Greenwich S.F., LLC v. Wong* (2010) 190 Cal.App.4th 739, 759, italics omitted.)

Under these authorities, the Sisters were required to raise their excessive-damages challenge in the trial court because the validity of their contentions depends on an analysis of the evidence. By not doing so, they forfeited their claim.

The Sisters' contention also fails on its merits. The appropriate amount of damages for emotional distress is a matter within the jury's determination. (See *Fletcher, supra*, 10 Cal.App.3d at p. 408.) Because there is no fixed standard for placing a monetary value on emotional distress and " 'the question of what may be reasonable compensation . . . is a matter on which there legitimately may be a wide difference of opinion,' " the question must necessarily be left to the trier of fact. (*Id.* p. 409.) The award may be based on the testimony of plaintiff alone and does "not require proof of

34

bankruptcy, physical illness or injury." (*Tan Jay Internat., Ltd. v. Canadian Indem. Co.* (1988) 198 Cal.App.3d 695, 708.)  The award may be reversed only where it "is so grossly disproportionate to the injury that the award may be presumed to have been the result of passion or prejudice." (*Fortman v. Hemco, Inc.* (1989) 211 Cal.App.3d 241, 259; see *Douglas v. Janis* (1974) 43 Cal.App.3d 931, 940.)

The jury awarded Marilyn $223,700 for past noneconomic loss and $100,000 for future noneconomic loss.  Given Marilyn's compelling testimony about her devastated condition in not being able to care for Frank in the last months of his life and her humiliation and pain in not being able to say goodbye at his funeral, we cannot presume the jury's determination was solely the product of "passion or prejudice."  The jury had the opportunity to see the witnesses firsthand, observe their demeanor, and evaluate their credibility and motivations for their conduct.  The jury was in the best position to evaluate Marilyn's emotional distress caused by the Sisters' wrongful conduct.  The Sisters' conclusory arguments to the contrary are unavailing.

## DISPOSITION

Judgment affirmed.  Appellants to bear respondent's costs on appeal.

_____

HALLER, Acting P. J.

I CONCUR:

_____

AARON, J.

35

O'ROURKE, J., Dissenting.

I respectfully dissent from the majority opinion affirming the judgment in favor of cross-complainant Marilyn Williams on her claim for intentional infliction of emotional distress against Frank Nihil's daughters, cross-defendants Catherine Hepler and Mary Jagers. The evidence in this case, even viewed most favorably to Williams with all inferences drawn in her favor, reveals what is unfortunately an all too commonplace intra-familial dispute that is legally and factually insufficient to support a claim of intentional infliction of emotional distress. Because Williams's evidence does not amount to evidence of outrageous and extreme conduct by Hepler and Jagers in acting as they did with respect to their father's care and estate, I would reverse the judgment.

The majority acknowledges the rigorous standards for a claim of intentional infliction of emotional distress. The qualifying conduct must be "so ' " 'extreme as to exceed all bounds of that usually tolerated in a civilized community.' " ' [Citation.] And [the] conduct must be ' " 'intended to inflict injury or engaged in with the realization that injury will result.' " ' " (*Hughes v. Pair* (2009) 46 Cal.4th 1035, 1050-1051.) Importantly, "[l]iability for intentional infliction of emotional distress ' "does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." (Rest.2d Torts, § 46, com. d.)' " (*Id*. at p. 1051.) The Restatement of Torts explains that "plaintiffs must necessarily be expected and required to be hardened to . . . occasional acts that are definitely inconsiderate and unkind. There is no occasion for the law to intervene in every case where some one's feelings are hurt." (Rest.2d Torts, § 46, com.

d.)  And, the fact the conduct is intentional, malicious or even criminal does not, standing alone, mean it is extreme and outrageous for purposes of this tort.  (*Ibid*.)  It must be so extreme " 'as to go *beyond all possible bounds of decency*, and to be regarded as *atrocious*, and *utterly intolerable* in a civilized community.' "  (*Alcorn v. Anbro Engineering, Inc.* (1970) 2 Cal.3d 493, 499, fn. 5 (*Alcorn*), italics added.)

Additionally, the context of the parties' relationship is important in the analysis of whether liability should be imposed.  (*Alcorn*, *supra*, 2 Cal.3d at p. 498, fn.2; see *Atchison, Topeka and Santa Fe Ry. Co. v. Buell* (1987) 480 U.S. 557, 569 & fn. 19 [acknowledging that California courts consider the context and relationship of the parties significant].)  When parties share an intensely personal relationship and discord arises, it is inevitable that someone will suffer ill feelings and emotional distress, often severe.  As a result, the party experiencing such upset should bring forth evidence of some conduct that brings the dispute outside the scope of the ordinary emotional trauma that accompanies a familial dispute and into the realm of extreme and outrageous conduct. (See, e.g., *Shoemaker v. Myers* (1990) 52 Cal.3d 1, 25 [discipline and criticism that are a normal part of the employment relationship do not constitutes "outrageous" conduct, even if it is intentional]; *Berkley v. Dowds* (2007) 152 Cal.App.4th 518, 533-535 [physician's communication urging appellant to terminate her husband's life support to reduce the cost of long-term care was not outrageous but appropriate in the context of a physician's relationship with his patient's family members, as are expressions of the physician's opinion regarding the patient's best interests]; see also *Corales v. Bennett* (9th Cir. 2009) 567 F.3d 554, 560-561, 571-572 [middle school vice principal who issued an "unduly

harsh" warning to a student and told the student he was going to end up in juvenile hall, after which the student committed suicide, did not engage in extreme and outrageous conduct].)

Here, the following facts are not in dispute. From 1995 to 2005, Nihil and Williams kept separate checking and savings accounts, but Nihil provided for Marilyn in a revocable trust amended and restated in 1995, by gifting her $20,000 cash under certain conditions. In late 1998, Nihil met with his estate planning attorney and communicated his intent to maintain his separate finances, accounts and assets. In 2006, Nihil started showing signs of Alzheimer's and vascular dementia and by early 2008 was diagnosed with mild cognitive impairment and early dementia.[1] In 2007, Nihil and Williams, with Williams's son's assistance, opened a joint account and transferred into it $100,000 from one of Nihil's investment accounts, after which Williams transferred the money to her

---

[1]     Nihil and Williams were long-time patients of Dr. Joseph Ramsdell. At his deposition, Dr. Ramsdell testified he did not remember whether he had ever screened Nihil for dementia or Alzheimer's. Dr. Ramsdell's trial testimony indicated that Williams and Nihil had noticed a change in Nihil's memory that seemed to come and go, and so in March 2006, Nihil had stopped taking a bladder medication called Vesicare, which had a side effect of delirium, but the medication change did not improve his memory. Dr. Ramsdell reinstituted the Vesicare and in April 2006 Nihil underwent a memory test, on which he scored a 24 out of 30. Dr. Ramsdell did not explain this result, but the cross-defendants' expert, Dr. Dominick Addario, testified that this score was "mostly likely early dementia signs." Dr. Ramsdell testified that Williams brought up Nihil's memory again in January 2008, telling him Nihil was having "mental issues" at night. By February 2008, Dr. Ramsdell diagnosed Nihil with mild cognitive memory impairment and early dementia. None of Dr. Ramsdell's testimony contradicts Dr. Addario's conclusions and opinion, based on his review of Nihil's medical records, that Nihil had family risk factors for dementia and biological risk factors for Alzheimer's, that in 2006 Williams and Nihil complained of memory problems, and that, as of 2006, Nihil mostly likely had vascular dementia and early Alzheimer's.

own account. Nihil also purchased a $50,000 certificate of deposit (CD) in his name and named Williams the beneficiary. In May 2008, Williams and Nihil opened another joint account, which Nihil funded with $40,000. Williams did not inform Hepler or Jagers of the $100,000 transfer when it occurred or the $50,000 CD, and Hepler learned of those events only after she discovered her status as successor trustee and began to examine Nihil's assets with the assistance of his estate planning attorney in the fall or winter of 2009.[2] Under the circumstances, it was entirely reasonable for Hepler and Jagers to become "very upset" and take steps to shield their father from Williams, who they believed had influenced Nihil to make changes to his long-time financial strategy regarding his estate and assets.[3] That Hepler and Jagers may have been mistaken about their father's wishes, or the actual value of their father's estate, is of no moment in

---

[2] Williams testified that when Hepler produced the power of attorney, Williams turned the $50,000 CD over to her. There is no evidence Williams returned the $100,000 from her and Nihil's joint account.

[3] As the majority acknowledges, Jagers stated in her deposition that she believed her decision to keep Williams away from Nihil "was justice . . . ." Based on this and other facts indicating Hepler and Jagers felt Williams had betrayed or injured their father, the majority concludes that the jury was entitled to infer that Hepler's and Jagers's justification for preventing Williams from seeing Nihil was "pretextual and unnecessary" given Hepler had legal control over Nihil's finances. I would conclude that such an inference is not reasonably or logically drawn from the evidence. (See *Tracy J. v. Superior Court* (2012) 202 Cal.App.4th 1415, 1424 [inferences may constitute substantial evidence if they are the product of logic and reason; speculation or conjecture is not substantial evidence]; *Western Digital Corp. v. Superior Court* (1998) 60 Cal.App.4th 1471, 1487 [" '[A] judgment may be supported by inference, but the inference must be a reasonable conclusion from the evidence and cannot be based upon suspicion, imagination, speculation, surmise, conjecture or guesswork. [Citation.]
Thus, an inference cannot stand if it is unreasonable when viewed in light of the whole record.' "].)

4

assessing whether it was reasonable for them to act as they did, or whether it was extreme and outrageous under the circumstances. In my view, no reasonable person or court would view their actions as extreme and outrageous, and the evidence does not, as a matter of law, meet that standard.

The evidence does not show, nor does it permit an inference, that Williams was particularly or unusually susceptible to emotional distress due to her September 2009 stroke, for which she was briefly hospitalized and fully recovered shortly thereafter.[4] Nor does the evidence support a conclusion that Hepler and Jagers owed any fiduciary or other duty to Williams or had some sort of position giving them unequal power over Williams. (Compare *Alcorn*, *supra*, 2 Cal.3d at p. 498 [work supervisor stood in a position or relationship of authority over the plaintiff employee]; *Hailey v. California Physicians' Service* (2007) 158 Cal.App.4th 452, 476-478 [health care insurance plan provider and insured]; *Cross v. Bonded Adjustment Bureau* (1996) 48 Cal.App.4th 266, 282-284 [fiduciary relationship between collection agency and judgment creditor]; *McDaniel v. Gile* (1991) 230 Cal.App.3d 363, 373 [fiduciary relationship between attorney and client].)

On this review for substantial evidence, I accept that Hepler and Jagers prevented Williams from visiting Nihil, with whom Williams had a 25-year unmarried relationship;

---

4       Dr. Ramsdell testified that after her September 2009 stroke, Williams made a "very good recovery quickly" and by October 3, 2009, was "very much back to normal." Williams testified that as a result of her September 2009 stroke she had a mild speech impediment and difficulty swallowing, but when asked whether she had "otherwise recovered pretty well," she answered, "I would say so."

5

that they knew Williams was heartbroken and desperate to see Nihil in the last months of his life and at the time of his death; that they did not inform Williams about Nihil's funeral, and that Williams was worried, distraught and "devastated" under the circumstances. But in considering whether Hepler's and Jagers's conduct was extreme and outrageous, Williams's level of distress does not factor in. The fact an act has the effect of causing one to experience emotional distress does not, in and of itself, compel a conclusion that the act itself is extreme and outrageous.

The law makes clear that extreme or outrageous conduct is worse than criminal or malicious conduct; it is beyond all bounds of decency, not merely offensive, deplorable or even unbearable, but utterly intolerable in a civilized society. Thus, even though Hepler's and Jagers's complained of conduct may have been deliberate, or even malicious and calculated to hurt Williams, the acts Hepler and Jagers took to protect their father do not rise to the level of conduct required for recovery. Such behavior, though callous and the consequences sympathy-evoking, does not transgress the bounds of socially tolerable behavior as a matter of law.

As an additional basis to reverse, there can be no liability as to Hepler because all of her actions were taken under a general durable power of attorney and thus within her legal rights. (See *Fletcher v. Western National Life Ins. Co.* (1970) 10 Cal.App.3d 376, 395; see also Rest.2d Torts, § 46, com. g [a party is not subject to liability for infliction of emotional distress when he has done no more than to insist upon his legal rights in a permissible way, even though he is well aware that such insistence is certain to cause emotional distress].) Because the evidence does not permit a conclusion that Hepler's

6

acts were illegal or impermissible, Hepler's conduct was privileged as a matter of law. (See *Kruse v. Bank of America* (1988) 202 Cal.App.3d 38, 67 [bank's actions in liquidating properties was an act of economic self interest and without a showing the Bank acted in an illegal or impermissible fashion, there is no liability for intentional infliction of emotional distress; testimony that bank officials knew that an execution sale of the plaintiff's home would be "upsetting" was of little relevance as to whether the conduct was outrageous in legal contemplation: "Perhaps all that can be said is that the axis of the financial world turns more on economic reality than human compassion"].)

For the foregoing reasons, I would reverse the judgment and enter judgment in favor of Hepler and Jagers on Williams's cause of action for intentional infliction of emotional distress.

O'ROURKE, J.

7